882 So.2d 928 (2004)
Steven POLLOCK, etc., et al., Petitioners,
v.
FLORIDA DEPARTMENT OF HIGHWAY PATROL, Respondent.
Michael Leeds, etc., et al., Petitioners,
v.
Florida Department of Highway Patrol, Respondent.
Nos. SC99-8, SC99-41.
Supreme Court of Florida.
June 10, 2004.
Rehearing Denied September 8, 2004.
*930 Dan Cytryn, Tamarac, FL, on behalf of Steven Pollock; and Jay M. Levy, Miami, FL, on behalf of Michael Leeds and Barbara Leeds, for Petitioners.
Sheridan Weissenborn and Charles C. Papy, Jr. of Papy, Weissenborn, Poole & Vraspir, P.A., Coral Gables, FL, for Respondent.
PER CURIAM.
We have for review State Department of Highway Patrol v. Pollack, 745 So.2d 446 (Fla. 3d DCA 1999),[1] based upon certified conflict with the decisions in Hoover v. Polk County Sheriff's Department, 611 So.2d 1331 (Fla. 2d DCA 1993), and Cook v. Sheriff of Collier County, 573 So.2d 406 (Fla. 2d DCA 1991). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

BACKGROUND AND MATERIAL FACTS
The tragic facts of this unfortunate case were summarized by the Third District Court of Appeal in its opinion in Pollack[2] (consolidated with Leeds below) as follows:
[O]n September 5, 1993, at approximately 4:00 a.m., the decedents Suzanne Leeds and Elissa Pollack were instantly killed when the automobile that Suzanne was driving, and [in which] Elissa was a passenger, collided into the back of an unlit tractor-trailer which had stalled in the right-hand lane of the Palmetto Expressway.
Earlier that morning, at approximately 3:00 a.m., Daniel Baregas had been *931 driving this tractor-trailer when it stalled on the Palmetto Expressway, about 1000 feet away from a crescent in the highway. At or about the same time, Raul Pedrero was driving home on the Palmetto when he suddenly encountered the stalled tractor-trailer in the right-hand lane which had no markers, lights, or flares. [Note 2] Mr. Pedrero had to slam on his brakes and veer into the adjacent lane to avoid hitting the tractor-trailer.
[Note 2] Moreover, the street lighting in the area was out, which made it all the more difficult to see the tractor trailer.
Mr. Pedrero exited the Palmetto, went to a gas station and telephoned 911. His call was transferred to FHP, where Mr. Pedrero informed the dispatcher that there was a stalled tractor-trailer on the Palmetto Expressway which had no lights and no warning signs. He also advised the FHP dispatcher that he had almost hit the truck. The dispatcher told Mr. Pedrero that he would "send a unit to check it out." Mr. Pedrero returned to the vicinity of the stalled tractor-trailer to await the arrival of FHP. He waited for twenty to twenty-five minutes, during which time he saw many vehicles take evasive action to avoid hitting the stalled tractor-trailer. When FHP did not show up after twenty-five minutes, Mr. Pedrero went home. Apparently, FHP's dispatcher had failed to enter Mr. Pedrero's call into the computer for assignment; consequently, no officer was dispatched to the scene. [Note 3] At the time, the FHP had internal operating rules requiring it to dispatch a trooper to the scene of stalled vehicles. [Note 4]
[Note 3] The evidence at trial showed that officers were available to answer the call had it gone out.
[Note 4] The FHP Communication Policy/Procedures Manual, Policy 12.04.03 General Information provides in relevant part:
All reports of vehicle crashes or incidents received in the communications center shall immediately be dispatched to the appropriate trooper. If the reported crash or incident is within a city limit, then it shall be reported to the local police department.
If there is going to be a delay in dispatching a crash or incident report due to manpower shortage, then the appropriate FHP supervisor shall be notified. This notification shall be documented on the dispatch card.
No matter how the information is received, a duty officer should learn how to quickly edit given information into the Official Standards, and then broadcast it.
In addition, Rule 12.00.00 entitled Crash Prevention, provides:
Crash prevention and crash investigation are the primary functions of the Florida Highway Patrol and the duty officer's role in these endeavors are of major importance. Strict adherence to this chapter will enable every officer to handle these responsibilities in an efficient and professional manner.
Pollack, 745 So.2d at 447-48 & nn. 2-4.
In both cases, the trial court, consistent with the jury verdicts, entered judgments for the plaintiffs. On appeal, the district court reversed and directed that final judgments be entered in favor of the Florida Highway Patrol (FHP), because "there was nothing to indicate that FHP's actions or inactions were operational in nature and ... FHP otherwise owed no special duty to the decedents, as a matter of law, so as to impose governmental tort liability." Id. *932 at 447. Furthermore, in response to the contention that FHP's duty toward the decedents arose from its own policies and procedures governing incident response, the district court held that "a governmental agency's policy or procedure manual cannot, standing alone, create an independent duty to individual citizens." Id. at 450. The court below certified a conflict with Hoover and Cook, despite finding the cases to be "distinguishable from a procedural standpoint" from the instant case. Id. at 450-51. This review followed.

ANALYSIS
We begin by narrowing our focus to the issue squarely before us. We are not faced here with the question of whether, in a modern society led to rely upon the social compact with its protective network of safeguards against public harm, the public should not be entitled to rely upon that network, nor whether a governmental agency entrusted with implementation of one such safeguard should ever ignore its responsibility to respond when alerted to a potential crisis. The answers to these morally compelling questions are obvious. However, while our rule of law generally gives effect to its moral underpinnings, these are not the only concerns manifest in the area of the law we address today. There is also an august body of law which we must follow in determining those instances in which the sovereign will be liable for failings such as occurred here.[3]
In the cases before us, FHP has successfully invoked sovereign immunity at the district court level in defending against the wrongful death actions filed by the Pollocks and the Leeds. In reviewing the district court decision, it is useful to restate the analytical framework applied to questions of governmental tort liability. The State of Florida has waived sovereign immunity from liability in tort actions "for any act for which a private person under similar circumstances would be held liable." Henderson v. Bowden, 737 So.2d 532, 534-35 (Fla.1999) (citing Art. X, § 13, Fla. Const.; § 768.28 Fla. Stat. (1995)).[4] Thus, "[t]here can be no governmental liability unless a common law or statutory duty of care existed that would have been applicable to an individual under similar circumstances." Henderson, 737 So.2d at 535.
If no duty of care is owed with respect to alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached. See Alderman v. Lamar, 493 So.2d 495, 497 n. 1 (Fla. 5th DCA 1986); see also Kaisner v. Kolb, 543 So.2d 732, 734 (Fla.1989) ("[C]onceptually, the question of the *933 applicability of ... immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.") (quoting Williams v. State, 34 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137, 139 (1983)). However, if a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty. See Henderson, 737 So.2d at 535. In making this assessment, it is necessary to ascertain the character of the allegedly negligent governmental act or omission. As this Court has determined, basic judgmental or discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity. See id. at 537-38.

Determination of Duty
In the instant case, the petitioners contend that the duty of care owed by FHP to the decedents arose from two separate sources. First, the petitioners assert that as the governmental entity with the ultimate responsibility to patrol the state highways, and to control and regulate traffic, FHP had a common law duty to maintain the highway in a reasonably safe condition, to warn of known dangers on the roadway, and to correct any dangerous conditions. Second, the petitioners argue that FHP's policies and procedures governing incident response created a duty to dispatch an officer to the scene of the stalled tractor-trailer.[5] After a careful review of these contentions and controlling caselaw, we conclude that FHP had no such duty of care.
The contention that FHP's common law duty to maintain the roadway and keep it free of obstructions is an outgrowth of its duty to patrol the state highways and control the movement of traffic misconstrues existing principles of duty and tort law. It is well settled that a public or private entity which owns, operates, or controls a property, including a roadway, owes a duty to maintain that property, and a corresponding duty to warn of and correct dangerous conditions thereon. See, e.g., Bailey Drainage Dist. v. Stark, 526 So.2d 678, 681 (Fla.1988) (holding that where a controlling governmental agency knowingly maintains an intersection it has a duty to warn of and make safe dangerous conditions that are not readily apparent); City of Orlando v. Heard, 29 Fla. 581, 11 So. 182, 184 (1892) (observing that the city must exercise due diligence in repairing defects after unsafe condition of the street or sidewalk is known or knowable); Jauma v. City of Hialeah, 758 So.2d 696, 698 (Fla. 3d DCA 2000) (holding that the city had a nondelegable duty to maintain its roads, sidewalks, and rights-of-way in a reasonably safe condition even where a third party created the defect); Travelers Ins. Co. v. Metro. Dade County, 510 So.2d 1240 (Fla. 3d DCA 1987) (ascribing duty of care to the county as the landowner-lessor of a marina); Wojtan v. Hernando County, 379 So.2d 198, 199 (Fla. 5th DCA 1980) (recognizing county's responsibility *934 as a landowner to free streets and sidewalks from obstruction created by another but about which the county knew or should have known). This theory based on concepts of "premises liability" does not apply, however, in the instant case where FHP had no ownership of or control over Florida's highways. See Alderman, 493 So.2d at 498 (determining that police had no duty to warn of leaning stop sign when they had no right to control or possess the intersections, roads, or stop signs).
Indeed, a review of the pertinent statutory provisions reveals that the responsibility for "the operation and maintenance of the roads" in this state falls to the Florida Department of Transportation and local governments for the roads within their respective jurisdictions. See § 335.04(2), Fla. Stat. (1993). By contrast, FHP's duties, as enumerated in section 321.05 of the Florida Statutes, are as follows:
321.05 Duties, functions, and powers of patrol officers.  The members of the Florida Highway Patrol ... shall perform and exercise throughout the state the following duties, functions, and powers:
(1) To patrol the state highways and regulate, control, and direct the movement of traffic thereon; ... [and] to enforce all laws now in effect regulating and governing traffic, travel, and public safety upon the public highways and providing for the protection of the public highways and public property thereon....
§ 321.05, Fla. Stat. (1993). Clearly, FHP's enabling statute does not afford the agency ownership or control over the state's roadways; therefore, FHP cannot be held to the standard of care that accompanies the right of ownership or control.
Nor does FHP have a duty to remove stalled or abandoned vehicles from the state highways. Florida law authorizes, but does not establish a legal duty, nor require, FHP officers to provide for the removal of stalled or abandoned vehicles. See § 316.194(3)(a), Fla. Stat. (1993). The statutory construct makes clear, however, that FHP's response to such disabled vehicles is permissive, rather than mandatory, and is in furtherance of its authority to enforce traffic laws, rather than pursuant to a duty to keep the highways free from obstructions.[6]
*935 Patrolling the state highways, controlling the flow of traffic, and enforcing the traffic laws are duties FHP owes to the general public, as opposed to an individual person. See Trianon Park Condo. Assoc. v. City of Hialeah, 468 So.2d 912, 921 (Fla.1985).[7] The responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person. See, e.g., Everton v. Willard, 468 So.2d 936, 938 (Fla.1985); Holodak v. Lockwood, 726 So.2d 815, 816 (Fla. 4th DCA 1999) (stating that in government tort suits, plaintiffs must prove that defendant breached a common law or statutory duty "owed to the plaintiff individually and not a tort duty owed to the public generally").
A special tort duty does arise when law enforcement officers become directly involved in circumstances which place people within a "zone of risk" by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger. See, e.g., Kaisner, 543 So.2d at 735 (determining that officer had a duty to protect a detained motorist from the hazard of onrushing traffic); Brown v. Miami-Dade County, 837 So.2d 414, 418 (Fla. 3d DCA 2001) (determining that county officer implementing sting operation owed a duty to exercise reasonable care to avoid harm to bystanders). The premise underlying this theory is that a police officer's decision to assume control over a particular situation or individual or group of individuals is accompanied by a corresponding duty to exercise reasonable care.[8] Where *936 police officers, such as FHP in the instant case, have not arrived on the scene or assumed any degree of control over the situation, the "zone of risk" analysis has no application. See Henderson, 737 So.2d at 536.
Florida courts have also determined that a special duty is established when a police officer makes a direct representation to a plaintiff, or one so closely involved with the plaintiff that their interests cannot be separated, that he or she will take a specified law enforcement action. See Brown v. City of Delray Beach, 652 So.2d 1150, 1153 (Fla. 4th DCA 1995). The assumption of a special duty guided the First District Court of Appeal's conclusion in Hartley v. Floyd, 512 So.2d 1022 (Fla. 1st DCA 1987), a wrenching case where the wife of a man delinquent in returning from a fishing trip asked the local sheriff to inspect the boat ramp for signs of her husband's vehicle. The sheriff agreed to undertake the task, failed to do so, yet reported back to the wife that he saw no signs of the vehicle, a representation the wife relied upon in foregoing further search efforts for a period of time. See id. at 1023-24. Based on those facts, the district court held that "notwithstanding the absence of any preexisting special duty to Mrs. Floyd, the sheriff's office .... having assumed the undertaking ... had an obligation to carry it out with reasonable care." Id. at 1024. The facts in Hartley stand in contrast to those in Dario v. Roth, 756 So.2d 262 (Fla. 3d DCA 2000), where the district court held that a sheriff who had informed a caller that he would respond to reports of a loose deer had no duty to a different motorist who was subsequently injured in an automobile collision with the deer. See id. at 264-65.
The principle applied in Hartley does not extend to the instant case, where FHP made no representation to either the decedents or their close relatives that a unit would be dispatched to the scene of the stalled tractor-trailer. Like the defendant in Dario, FHP did not, by word or deed, create a duty of care toward the decedents over and above its general duty to enforce the state's traffic laws. Thus, FHP owed no duty of care to the decedents to respond to the emergency call regarding the stalled tractor-trailer.
We further conclude that FHP's internal operating procedures and policies did not impose a duty to dispatch officers to the scene of the stalled tractor-trailer. On this issue, we approve the reasoned analysis of the district court which concludes that, in the context of governmental tort litigation, written agency protocols, procedures, and manuals do not create an independent duty of care.[9] *937 See Pollack, 745 So.2d at 450. While a written policy or manual may be instructive in determining whether the alleged tortfeasor acted negligently in fulfilling an independently established duty of care, it does not itself establish such a legal duty vis-a-vis individual members of the public. Accord Alderman, 493 So.2d at 497-98 (holding that FHP regulation requiring officers to report damaged road signs did not impose a duty to report damaged signs, repair them, or warn motorists of the potential dangers); see also Mayo v. Publix Super Markets, Inc., 686 So.2d 801, 802 (Fla. 4th DCA 1997) (holding that a company's internal safety policies may serve as evidence relevant to standard of care but do not themselves establish that standard); Gunlock v. Gill Hotels Co., Inc., 622 So.2d 163, 164 (Fla. 4th DCA 1993) (same with regard to company policy); Metro. Dade County v. Zapata, 601 So.2d 239, 243-44 (Fla. 3d DCA 1992) (same with regard to rules governing conduct of county lifeguards). This principle applies, unless, of course, the sovereign adopts such protocols and procedures as standards of conduct, in which case there would exist an independent duty of care. See City of Jacksonville v. DeRay, 418 So.2d 1035, 1036-37 (Fla. 1st DCA 1982) (affirming final judgment against the City for its failure to follow the protocols provided for in the traffic control devices manual which the City had adopted as the standard for signalization and street markings); State Dep't of Transp. v. Cooper, 408 So.2d 781 (Fla. 2d DCA 1982) (same).
Based on the foregoing, we determine that FHP had no special duty either to maintain the road on which this horrible accident occurred, or to dispatch officers in response to the emergency call. Importantly, we note that the duty analysis in the conflict cases cited by the district court below comports with our decision here. In Cook, the district court determined that law enforcement officials are generally not under a common law or statutory duty to report, repair, or warn motorists of damaged road signs. See Cook, 573 So.2d at 408. The Hoover court similarly determined that, in general, law enforcement officials have no common law or statutory duty to remove the vehicle that had obstructed the roadway and was struck by a motorist who was killed as a result.[10]See Hoover, 611 So.2d at 1333.
These opinions diverge from our decision here today, however, in determining that whether internal policies and procedures create an independent duty of care is a fact question that must be taken as true in judging whether a trial court properly dismissed an action for failure to state a claim. See Cook, 573 So.2d at 408. Pursuant to our holding with regard to the legal force of internal operating policies, the assertion that such policies create an independent duty of care is legally erroneous, and cannot sustain an otherwise insufficient claim against a motion to dismiss. For that reason, we disapprove those portions of Cook and Hoover which provide that a claim can survive a motion to dismiss based on the contention that internal agency protocols and procedures create an independent duty not otherwise established by statutory or common law.

*938 Sovereign Immunity

While we conclude that the lack of a statutory or common law duty is determinative in this case, and renders a sovereign immunity analysis unnecessary, we address the topic to clarify confusion that might arise from the decision below. As reiterated throughout this opinion, a determination that a governmental actor owed a duty of care with regard to the allegedly negligent conduct is a prerequisite to proceeding with a sovereign immunity analysis and ultimately determining whether governmental tort liability exists. Therefore, characterizing a governmental action or omission as operational or discretionary in nature has no bearing on the initial duty analysis. We believe that this clarification is necessary because of the language in the district court's decision stating that "[b]ased upon the foregoing we find that FHP's actions or inactions were not operational in nature and that no special duty was owed to the decedents so as to constitute a waiver of sovereign immunity." Pollack, 745 So.2d at 450.
We believe the foregoing excerpt could be interpreted as conflating the duty and sovereign immunity analyses. The district court's opinion should not be interpreted as holding that governmental tort liability attaches as a matter of law in the absence of a statutory or common law duty if the activity in question is operational in nature. Such a conclusion would contravene fundamental and oft-repeated principles of duty and the law of sovereign immunity. See Trianon, 468 So.2d at 919 ("In order to subject the government to tort liability for operational phase activities, there must first be either an underlying common law or statutory duty of care in the absence of sovereign immunity."). Furthermore, we specifically refuse the petitioners' invitation to alter the law of sovereign immunity to provide that if a governmental act is operational in nature, then there automatically exists a duty of care to all persons injured by the act or omission.

CONCLUSION
We in no way condone FHP's failure to take prompt action when it was alerted to the potential danger caused by the stalled tractor-trailer. However, under settled principles of Florida law, having not responded to the scene to become directly involved in the roadway circumstances, FHP had no legally recognized particular tort duty which would generate or impose governmental tort liability with regard to responding to the scene, the issuance of warnings of the potential danger, or provision for the removal of the tractor-trailer under the circumstances presented in this case. We therefore approve the decision of the district court as clarified herein. We disapprove the decisions in Cook and Hoover to the extent described in this decision.
It is so ordered.
WELLS, LEWIS, CANTERO, and BELL, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion, in which WELLS, J., concurs.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
ANSTEAD, C.J., specially concurring.
I fully concur in the majority opinion. Every day in this state thousands of tragic incidents occur where government emergency personnel are called on to assist or intervene. Of course, the timing and effectiveness of emergency response may truly mean the difference between life and death or other serious consequences. "If only the responders had arrived sooner" could be a common refrain in many, if not a majority, of those incidents.
*939 The question then becomes whether, in addition to those who may have actually caused or created the emergency, we are to also make the emergency responders civilly liable to those at risk in the emergency. Our consistent case law to date, as discussed in the majority opinion, is to reject such a cause of action against the government based upon neglect or delay in responding. On the other hand, we have recognized exceptions where the actions of the responders have played a more direct role in causing harm.
Underlying our rejection of a routine cause of action against the responders is a recognition that unlike private providers of a service who may contract or not at will, government emergency responders are compelled to act by virtue of a legislative public policy decision to provide our citizens with this important service to the public welfare. The very real and practical question is whether this valuable public service could or would be provided if every response put the government at risk for damages to the victims of the emergency if the response was not adequate. To date, however, our case law suggests that government can make the public policy decision to provide emergency services without the government also assuming liability for the reasonableness of the response in each of the thousands of incidents that occur each day in Florida.
Would the burglar have gotten away with the family silver? Would the kidnapper have been foiled? Would the house have burned down? Would the drunk driver have caused the deadly wreck? The potential situations are endless, and, of course, no one wants to see these tragedies. But the reality is they are possible every time 911 is called, and that is the specter we face if we are to recede from our prevailing law. So, of course the police and other emergency responders have a duty to respond to emergencies and they carry a heavy burden each time they are called. To date, however, we have declined to recognize the government's liability in tort each time a call for help is received.
WELLS, J., concurs.
PARIENTE, J., dissenting.
I respectfully dissent. Under the circumstances of this case I conclude that FHP owed a duty of care to the decedents, Suzanne Leeds and Elissa Pollack, and that FHP's actions in this case were operational in nature, subjecting FHP to liability under Florida's waiver of sovereign immunity statute.[11] Therefore, I would quash the Third District's decision in this case and remand with instructions to reinstate the jury's verdict in favor of the plaintiffs.
The relevant facts are not in dispute. In the early morning hours of September 5, 1993, FHP received a 911 call alerting it to the fact that there was a stalled tractor-trailer in the right hand lane of the Palmetto Expressway. Although FHP assured the caller that a unit would be sent to the scene of the stalled vehicle, this did not occur due to the dispatcher's failure to log the call into the system. Leeds and Pollack were subsequently killed when the car that Leeds was driving collided with the rear end of the tractor-trailer. A jury returned a verdict in favor of the plaintiffs, finding FHP fifty percent negligent and the tractor-trailer driver fifty percent negligent.
In Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla.1979), this Court interpreted Florida's waiver of sovereign immunity statute for the first *940 time and came to two conclusions. First, the Court addressed whether its decision in Modlin v. City of Miami Beach, 201 So.2d 70 (Fla.1967), survived "notwithstanding the enactment of section 768.28." Commercial Carrier, 371 So.2d at 1015. In Modlin, the Court considered whether a city inspector could be held liable for the death of the plaintiff's wife, who was killed when a retail store's overhead storage balcony collapsed. See 201 So.2d at 73. The Court noted that "a fundamental element of actionable negligence is the existence of a duty owed by the person charged with negligence to the person injured," but that "this duty must be something more than the duty ... owe[d] to the public generally." Id. at 75. Because the inspector owed no duty to Mrs. Modlin different from the duty owed to the general public, the Court concluded that the inspector could not be held liable for Mrs. Modlin's death. See id. at 76. As later explained by this Court, Modlin created a "general duty-special duty" dichotomy (the Modlin doctrine), which has been "characterized as a theory which results in a duty to none where there is a duty to all." Commercial Carrier, 371 So.2d at 1015.
After the enactment of Florida's waiver of sovereign immunity statute, the issue before the Court in Commercial Carrier was whether the Modlin doctrine, which was "a function of municipal sovereign immunity and not a traditional negligence concept which [had] meaning apart from the governmental setting," was still valid. Id. The Court answered this question in the negative, and explained:
Predicating liability upon the "governmental-proprietary" and "special duty-general duty" analyses has drawn severe criticism from numerous courts and commentators. Consequently, we cannot attribute to the legislature the intent to have codified the rules of municipal sovereign immunity through enactment of section 768.28, Florida Statutes (1975). Even if we were disposed toward respondents' argument, a plain reading of the statute would deny such a construction. Municipalities are unequivocally included within the definition of "state agencies or subdivisions." § 768.28(2), Fla. Stat. (1975). Were it the intent of the legislature merely to make the law of municipal sovereign immunity applicable to the state, its agencies and political subdivisions, there would have been no need to include municipalities within the operation of the statute. Consequently, we conclude that Modlin and its ancestry and progeny have no continuing vitality subsequent to the effective date of section 768.28.

Id. at 1016 (footnote omitted) (emphasis supplied).
The second issue decided by the Court in Commercial Carrier was the scope of the waiver of sovereign immunity created by section 768.28. See id. Noting that  unlike other waiver of sovereign immunity statutes  section 768.28 does not have an express exception for discretionary decisions, the Court nonetheless created a narrow exception for certain policymaking, planning, or judgmental governmental functions. See id. at 1020. In order to identify these functions, the Court distinguished between "planning" and "operational" level activities, with only the former remaining immune from liability. Id. at 1022. Thus, the Commercial Carrier decision addressed both the duty element of a negligence claim, eliminating the "special duty-general duty" distinction of Modlin, and the scope of section 768.28, adopting the "planning level" versus "operational level" test for determining whether sovereign immunity insulates an agent of the state or its political subdivisions from liability.
*941 Six years later, in April 1985, this Court released a series of decisions that implicitly receded from Commercial Carrier's clear rejection of the Modlin doctrine. See Trianon Park Condominium Ass'n, Inc. v. City of Hialeah, 468 So.2d 912 (Fla.1985); Everton v. Willard, 468 So.2d 936 (Fla.1985); Duvall v. City of Cape Coral, 468 So.2d 961 (Fla.1985); Rodriguez v. City of Cape Coral, 468 So.2d 963 (Fla.1985); City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla.1985); City of Daytona Beach v. Huhn, 468 So.2d 963 (Fla.1985); Reddish v. Smith, 468 So.2d 929 (Fla.1985). Beginning with Trianon and Everton, this Court returned to the "circuitous reasoning" of Modlin, that "results in a duty to none where there is a duty to all." Commercial Carrier, 371 So.2d at 1015.
Because we have never explicitly receded from Commercial Carrier, I disagree with the majority's conclusion that "[t]he responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person." Majority op. at 935. Chief Justice Anstead concludes in his specially concurring opinion that the majority's view is based on "a recognition that unlike private providers of a service who may contract or not at will, government emergency responders are compelled to act by virtue of a legislative public policy decision to provide our citizens with this important service to the public welfare." Specially concurring op. at 938. This rationale overlooks the fact that the Legislature has made a public policy decision to waive sovereign immunity in tort actions. Thus, the fact that these services are provided by a governmental entity should have no bearing on whether a duty to use reasonable care exists in any particular case.
Further, I disagree with Chief Justice Anstead's conclusion that our case law allows the government "to provide emergency services without the government also assuming liability for the reasonableness of the response." Specially concurring op. at 939. As the majority recognizes, a duty arises when "a police officer makes a direct representation to a plaintiff, or one so closely involved with the plaintiff that their interest cannot be separated, that he or she will take specified law enforcement action." Majority op. at 936. Thus, the basis on which the majority, including Chief Justice Anstead, concludes that there is no duty in this case cannot rest on the view that a governmental entity never assumes liability for the reasonableness of its response. Rather, the Court's decision rests on drawing what I consider to be an arbitrary line between a direct representation made to one "closely involved with the plaintiff" and a direct representation made to a third party.
In my view, the better approach in analyzing duty in governmental tort cases is to focus on conventional tort principles, and in particular foreseeability, which this Court has recognized as "crucial in defining the scope of the general duty placed on every person to avoid negligent acts or omissions." McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992). As we noted in McCain,"Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." Id. Moreover, "[i]t is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." Union Park Memorial Chapel v. Hutt, 670 So.2d 64, 66-67 (Fla.1996); see also McCain, 593 So.2d at 503 ("[E]ach defendant who creates a risk is required to exercise prudent *942 foresight whenever others may be injured as a result.").
The Restatement (Second) of Torts provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to use reasonable care increases the risk of such harm, or
....
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Restatement (Second) of Torts, § 324A (1965) (emphasis added). We explained in Union Park that "[v]oluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to ... reliance upon the undertaking confers a duty of reasonable care, because it thereby `creates a foreseeable zone of risk.'" 670 So.2d at 67 (quoting McCain, 593 So.2d at 503); see also Dep't of Health & Rehabilitative Servs. v. Yamuni, 529 So.2d 258, 261 n. 3 (Fla.1988) ("[T]he voluntary assumption of responsibilities which might be undertaken by others creates a duty of care on the part of the assuming party.").
In this case, FHP was clearly authorized to respond to the stalled tractor-trailer under both section 321.05, Florida Statutes (1993), which requires FHP to patrol the state highways, regulating, controlling, and directing the flow of traffic, and section 316.194(3)(a), Florida Statutes (1993), which authorizes FHP to move a vehicle stopped on the main-traveled part of a highway. Nevertheless, the majority concludes that because FHP had not "arrived on the scene or assumed any degree of control over the situation, the `zone of risk' analysis has no application." Majority op. at 936. This conclusion overlooks the fact that FHP assumed control over the situation when the dispatcher assured Mr. Pedrero that he would "send a unit to check it out." It was at this time that FHP assumed a common law duty of care to the decedents, who were a part of the small group of individuals that foreseeably could have been injured by the tractor-trailer's presence in the right-hand lane of the highway. Cf. Yamuni, 529 So.2d 258, 262 n. 3 (noting that the state had a common law duty to protect a child from abuse when the agency discouraged relatives of the infant from further action). In other words, by failing to respond after assuring Mr. Pedrero that a unit would be sent, FHP created a foreseeable "zone of risk that pose[d] a general threat of harm" to Leeds and Pollack. McCain, 593 So.2d at 502.
Having concluded that FHP owed a duty of care to the decedents, I further conclude that FHP is not shielded from liability in this case. The ministerial duty of logging 911 calls into FHP's computer for assignment does not fall within the category of governmental activity that involves planning. See Commercial Carrier, 371 So.2d at 1021 ("Planning level functions are generally interpreted to be those requiring basic policy decisions...."). As noted in the majority opinion, FHP's Communication Policy/Procedure Manual states that "[a]ll reports of vehicle crashes or incidents received in the communication center shall immediately be dispatched." Majority op. at 931 (emphasis supplied). The manual's directive requiring the dispatch of officers to all reports of incidents represents the policy decision made by FHP. The act of logging the reports received *943 by FHP is an operational-level activity that falls directly within the waiver of sovereign immunity contained in section 768.28.
In sum, I conclude that FHP assumed a duty to the decedents by assuring Mr. Pedrero that an officer would be dispatched to the area of the stalled tractor-trailer. I further conclude that the dispatcher's failure to log the call into the system is not a planning-level function protected by sovereign immunity. This case was therefore properly submitted to the jury, which considered the facts before it and found that FHP acted negligently. Accordingly, I would quash the Third District's decision in this case and remand with instructions to reinstate the jury's verdict in favor of the plaintiffs.
QUINCE, J., concurs.
NOTES
[1] Even though the cases were consolidated at the district court, both Pollock and Leeds filed petitions seeking this Court's discretionary review. We have consolidated the proceedings from these two separate petitions for review (which were consolidated below) for disposition by one opinion.
[2] The parties here consistently refer to the personal representative and the deceased as "Pollock"; however, the decision below (with one exception, see 745 So.2d at 450, n. 9) reflects the spelling as "Pollack."
[3] For a thorough overview of the historical development of the sovereign immunity doctrine in Florida, see Gerald T. Wetherington & Donald I. Pollack, Tort Suits Against Governmental Entities in Florida, 44 Fla. L.Rev. 1 (1992).
[4] Section 768.28(1) specifically provides:

In accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.
§ 768.28(1), Fla. Stat. (1993).
[5] Petitioners also contend that once FHP assumed the task of operating the 911 system, it had a duty to exercise reasonable care in its operation. We find no merit in this argument because, as indicated by the factual background set forth in the district court's decision, the 911 system operated as intended in the instant case. The 911 operator received Mr. Pedrero's call and transferred him to FHP, where Mr. Pedrero informed the FHP dispatcher that the tractor-trailer was stalled in the roadway. See Pollack, 745 So.2d at 447. The FHP dispatcher, in turn, failed to log the call into the computer system for assignment, and, consequently, officers were not dispatched to the scene. See id. Therefore, the operation of the 911 system itself is of no consequence in this case.
[6] Section 316.194, Florida Statutes (1993), provides, in pertinent part:

316.194. Stopping, standing or parking outside of municipalities. 
(1) Upon any highway outside of a municipality, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park, or so leave the vehicle off such part of the highway; but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles, and a clear view of the stopped vehicle shall be available from a distance of 200 feet in each direction upon the highway.
(2) This section shall not apply to the driver or owner of any vehicle which is disabled while on the paved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving the disabled vehicle in such position, or to passenger-carrying buses temporarily parked while loading or discharging passengers, where highway conditions render such parking off the paved portion of the highway hazardous or impractical.
(3)(a) Whenever any police officer finds a vehicle standing upon a highway in violation of any of the foregoing provisions of this section, the officer is authorized to move the vehicle, or require the driver or other persons in charge of the vehicle to move the same, to a position off the paved or main-traveled part of the highway.
(b) Officers are hereby authorized to provide for the removal of any abandoned vehicle to the nearest garage or other place of safety, cost of such removal to be a lien against motor vehicle, when said abandoned vehicle is found unattended upon a bridge or causeway or in any tunnel, or on any public highway in the following instances:
1. Where such vehicle constitutes an obstruction of traffic....
(Emphasis supplied.)
[7] In Trianon, the Court recognized four categories of governmental functions and activities: (I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of public safety; (III) capital improvements and property control operations; and (IV) professional, educational, and general services for the health and welfare of the citizens. See Trianon, 468 So.2d at 919. The Trianon Court expressed the parameters of governmental responsibility within this framework:

There is no governmental tort liability for the action or inaction of governmental officers or employees in carrying out the discretionary governmental functions described in categories I and II because there has never been a common law duty of care with respect to these legislative, executive, and police power functions, and the statutory waiver of sovereign immunity did not create a new duty of care. On the other hand, there may be substantial governmental liability under categories III and IV.
Id. at 921. FHP's duties enumerated under section 321.05 of the Florida Statutes are clearly category II functions. We disagree with petitioner Pollock's assertion that FHP's duties can be categorized as category III, "property control" functions, or as category IV, general services for the health and welfare of the citizenry.
[8] Compare Everton, 468 So.2d at 938 (no common law duty to enforce the law or make an arrest); Duvall v. City of Cape Coral, 468 So.2d 961, 961 (Fla.1985) (no liability for failure of city police to arrest an intoxicated driver); Carter v. City of Stuart, 468 So.2d 955, 956 (Fla.1985) (no liability for city's failure to enforce animal control ordinance); Wong v. City of Miami, 237 So.2d 132, 134 (Fla.1970) (no liability for damage to property occurring after mayor ordered police officers removed from riot scene); Laskey v. Martin County Sheriff's Dep't, 708 So.2d 1013, 1014 (Fla. 4th DCA 1998) (duty to relay call regarding traffic offender owed to the public at large, not to a third party subsequently injured by an act of the traffic offender); and McFadden v. County of Orange, 499 So.2d 920, 923 (Fla. 5th DCA 1986) (no duty to warn of malfunctioning traffic light where county neither created the dangerous condition nor had any power or authority to alter the condition) with Henderson, 737 So.2d at 536 (duty of care arising from police officer's act of instructing an intoxicated man to drive to a convenience store and call for a ride home where the driver continued on and subsequently collided with a tree killing two passengers in the vehicle) and White v. City of Waldo, 659 So.2d 707, 710-11 (Fla. 1st DCA 1995) (duty of care arising from police officer's act of chasing a loose horse in an unlit patrol car with a private citizen on the hood).
[9] In so concluding, we reject petitioner Leeds' contention that the decision below conflicts with this Court's decision in City of Pinellas Park v. Brown, 604 So.2d 1222 (Fla.1992), which, according to the petitioner, suggests that internal policies can form the basis of a duty in a negligence action. While this Court made reference to the City's hot-pursuit policy in that case, we made clear that the duty forming the basis of liability arose from the danger created when as many as twenty police vehicles attempted to chase down one man who had run a red light. See id. at 1226. We expressly stated that "[s]uch a duty would have existed whether or not any hot-pursuit policy existed." Id.
[10] While the procedural posture of Hoover complicates a meaningful comparison, any distinction between the duty analysis in that case and the instant case may rest on the fact that the sheriff in Hoover had known about the abandoned vehicle for over two weeks and had responded to and inspected the vehicle and circumstances prior to the accident, but failed to provide for the vehicle's removal. See id. at 1332.
[11] See § 768.28, Fla. Stat. (2003).