SAWAYA, J.
On a dark and unlit road shortly before sunrise, Kathleen Shinkle was driving her automobile in a rural part of Flagler County when she struck a dead horse lying on the roadway. She was traveling at approximately forty-five miles per hour, arid the collision with the dead animal caused her vehicle to flip over and land on its roof. Shinkle suffered serious injuries. She filed suit against James Manfre- as Sheriff of Flagler County, whom we will refer to as “the Sheriff.” The jury returned a verdict in favor of Shinkle. The trial court subsequently granted Shinkle’s motion for additur and rendered judgment in her fa-' vor with the additur included in the final amount of damages.
The issues presented are whether the Sheriff owed a duty of care (either common law or statutory) to Shinkle and, if a duty was owed, whether the action is barred by the doctrine of sovereign immunity. Proper resolution of these issues requires, discussion of the following: 1) general principles of duty of care and sovereign immunity; 2) the public-duty doctrine relating to common law and statutory duties of care; 3) the special tort duty exception; and 4) the undertaker’s doctrine. Each will be -discussed seriatim after we present the factual and procedural background of the case. As we progress, we will explain why the principles of sovereign immunity are not a salient issue. As an initial matter, we note that the Sheriff raised the issue of whether the additur was proper. Because that issue is rendered moot by virtue of our resolution of the other issues presented, we will address it no further in this opinion.

1. Factual and Procedural Background

The essence of the underlying lawsuit is the Sheriffs limited involvement with two horses that had escaped the confines of then’* pasture prior to Shinkle’s accident. The fate of one was' its demise on the roadway. The facts are undisputed ánd do not require lengthy discussion.
About an hour and a half prior, to Shin-kle’s accident, the Flagler County Sheriffs Office, received a phone call reporting two. horses roaming-on the side of the road. There is no evidence that Shinkle had any contact with the Sheriff prior to her accident. A deputy responded to the location, watched as the horses ran up a driveway towards a residence and went back into what appeared to be a pasture.' Evidence was presented' at trial that the glow from the lights on the patrol car may have spooked the horses and caused them to return to the pasture. The deputy then cleared the call without getting out of his *644 car or attempting to make contact with the property owner.
One of the horses apparently reemerged from the pasture and proceeded to the roadway, where it was struck and killed by a motorist. The dead animal was lying on the roadway when Shinkle subsequently came along, struck it, and flipped her vehicle.
Shinkle filed a negligence action against the Sheriff alleging that the deputy owed a duty of care to all those on the county roads (including Shinkle) and that the deputy breached the duty owed to Shinkle by negligently responding to the call and by failing to contact the presumed owners of the horses or otherwise ensure that the horses would not return to the roadway. The trial court denied the Sheriffs motion for summary judgment and motion for a directed verdict at trial, which were both premised on the Sheriffs argument that he owed no common law or statutory duty of care to Shinkle pursuant to the public-duty doctrine. Shinkle argued that even if the Sheriff owed her no common law or statutory duty of care under the public-duty doctrine, he owed her a special tort duty of care or, in the alternative, a duty of care pursuant to the undertaker’s doctrine. The Sheriff presented an alternative argument that even if he owed Shinkle a duty of care, the acts alleged were discretionary acts for which sovereign immunity applies to bar the claim.

II. General Principles of Duty of Care and Sovereign Immunity

The doctrine of sovereign immunity derives from English common law and the medieval notion that the king could not be sued in his own courts without his consent and, thus, “the king can do no wrong.” Cauley v. City of Jacksonville, 403 So.2d 379, 381 (Fla.1981). Sovereign immunity made its way into American jurisprudence via the federal courts, eventually becoming accepted doctrine in Florida law. The justification for the sovereign immunity doctrine in American jurisprudence mirrors that of the English courts and is based on “the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.” Am. Home Assurance Co. v. Nat’l R.R. Passenger Corp., 908 So.2d 459, 471 (Fla.2005) (quoting Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907)). From this premise, the courts found further justification for sovereign immunity by reasoning that immunity was necessary to preserve the separation of powers doctrine by preventing courts from encroaching on legislative authority by judgments rendered against the government without its consent; to prevent encroachment on the government’s authority to make decisions based on governmental discretion; and to preserve the public treasury by restricting damage awards against the government for its torts. Id.
Just as the king may consent to being sued, so too may the government, and the principles just discussed form the basis for the limitations placed on the Florida Legislature’s eventual consent to waive sovereign immunity. Id.; Commercial Carrier Corp. v. Indian River Cty., 371 So.2d 1010, 1014 (Fla.1979). The underpinnings of this consent are found in the Florida Constitution, which grants to the Legislature the authority to enact general legislation to waive the state’s sovereign immunity. See art. X, § 13, Fla. Const.[1] The Legislature enacted section 768.28, Florida Statutes, to provide for a limited waiver of the state’s sovereign im *645 munity “in tort actions for any act for which a private person under similar circumstances would be held liable.” Henderson v. Bowden, 737 So.2d 532, 534-35 (Fla.1999); see also § 768.28(1), (5), Fla. Stat. (2008). Therefore, as a threshold matter, there can be no governmental liability unless a common law or statutory duty of care was owed to the injured party. Wallace v. Dean, 3 So.3d 1035, 1044-45 (Fla.2009); Am. Home, 908 So.2d at 471; Pollock v. Fla. Dep’t of High. Patrol, 882 So.2d 928, 932-33 (Fla.2004); Henderson, 737 So.2d at 535; Kaisner v. Kolb, 543 So.2d 732, 733-34 (Fla.1989). Thus, thé prominence of duty of care in the realm of tort law as a “minimal threshold legal requirement for opening the courthouse doors,” McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla.1992) (footnote omitted), renders it an equally important element in cases where injured parties seek to hold a governmental entity accountable for their damages. Wallace, 3 So.3d at 1047. As the court explained in Wallace, “[u]nder traditional principles of tort law, the absence of a duty of care between the defendant and the plaintiff results in a lack of liability, not application of immunity from suit.” Id. at 1044 (citing Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003)). Therefore, only if a duty of care was owed to the injured individual does the analysis shift to a determination of whether sovereign immunity bars the action. Id. at 1053; Am. Home, 908 So.2d at 471; Pollock, 882 So.2d at 933; Henderson, 737 So.2d at 537.

III. Common Law and Statutory Duties of Care: The Public-Duty Doctrine.

Analysis of the duty of care requirement poses a question of law for the court to decide rather than the trier of fact. Wallace, 3 So.3d at 1046; McCain, 593 So.2d at 502. Because there is no catalogue that lists every circumstance that may give rise to a duty of care, the court in Wallace explained that “[w]here questions of duty arise in connection with potential governmental liability, we have provided a ‘rough,’ general guide concerning the type of activities that either support or fail to support the recognition of a duty of care between a governmental actor and an alleged' tort victim.” 3 So.3d at 1047 (citing Trianon Park Condo. Ass’n v. City of Hialeah, 468 So.2d 912, 919 (Fla.1985)). Generally referred to as the public-duty doctrine, this guide was initially formulated by the court in Trianon and consists of four general categories that inform whether a duty of care is owed by a governmental entity to an individual. 468 So.2d at 919-21. Of those categories, “enforcement of laws and protection of the public safet/’ applies to the instant case.
Central to the public-duty doctrine is the principle consistently applied by the courts that government liability may not be established unless there is a common law or statutory duty of care owed by the government to the individual rather than to the general public. Wallace, 3 So.3d at 1045; Pollock, 882 So.2d at 933; Henderson, 737 So.2d at 537 (“Having concluded that the deputies, owed the plaintiffs’ decedents a duty of care separate from the general duty owed to the public as a whole, we must now decide whether the deputies’ actions are, nevertheless, protected by sovereign immunity.”); Vann v. Dep’t of Corr., 662 So.2d 339, 340 (Fla.1995); Everton v. Willard, 468 So.2d 936, 938 (Fla.1985); Willingham v. City of Orlando, 929 So.2d 43, 50 (Fla. 5th DCA 2006) (“There could be, however, no governmental liability unless a common law or statutory duty of care existed that would have been applicable to an individual, as opposed to the .general public, under similar circumstances.” (citing Pollock, 882 *646 So.2d at 931)); Austin v. Mylander, 717 So.2d 1073, 1075 (Fla. 5th DCA 1998) (“A governmental duty to protect its citizens is a general duty to the public as a.whole, and where there.is only a general duty to protect the public, there is no duty of care to an individual citizen which may result in liability.” (citing Everton, 468 So.2d at 938)). Thus, in the context of. cases involving..this particular Trianon category, the courts have held that because the duties to enforce laws and protect all citizens are owed to the public, law enforcement officers do not owe those duties to injured individuals like Shinkle. Wallace, 3 So.3d at 1045; Henderson, 737 So.2d at 537.
Shinkle contends that a statutory duty of care was owed individually to her pursuant to' section 588.16, Florida Statutes (2008). That statute provides:
It shall be the duty of the sheriff or her or his deputies or designees, or any other, law enforcement officer of the county, the county animal control center, .or state highway patrol officers, where livestock is found to be running at large or straying, to take up, confíne, hold, and impound any such livestock, to be disposed of as hereinafter provided.
§ 588.16, Fla. Stat. (2008).
The intended purpose for enacting this statute belies the argument that the statute creates a duty of care to individuals like Shinkle rather than the public at large. This statute was enacted in 1949 as part of the Warren Act. Selby v. Bullock, 287 So.2d 18, 20 (Fla.1973) (“[W]e note that Sections 588.12 through 588.26 are known as the Warren Act.’ ”) (footnote omitted). The purpose of the Warren Act was to change the archaic laws that existed at the time requiring property owners to fence their property to keep wandering livestock out rather than requiring the livestock owner to fence in his livestock. Fisel v. Wynns, 667 So.2d 761, 763 (Fla.1996). That was the era of the open range when the interests of agrarian livestock owners were preeminent and laws were enacted
to establish and protect a right in resident owners of stock for their cattle and other domestic animals to range and graze on all uninclosed lands free of charge, and without any liability for any damage resulting from their going upon or grazing on any lands whatsoever not inclosed by a lawful fence.
Savannah, Fla. & W. Ry. Co. v. Geiger, 21 Fla. 669, 684 (1886). As the court in Geiger explained, “[a] different policy than that which has prevailed would have proven ruinous to the important stock interests of different sections of the State....” Id. at 685.
When the Legislature enacted the Warren Act, it intended to eliminate the open range laws and provide “a statewide scheme, for keeping livestock off the roads.” Fisel, 667 So.2d at 763; see also Hanson v. Scharber, 749 So.2d 563, 563 (Fla. 2d DCA 2000). The court in Selby explained that in implementing this scheme,. “[t]he Warren Act has delegated, responsibilities and rights among livestock owners and motorists consistent within the goals of promoting the safety of highway users and the livestock industry.” 287 So.2d at 21. In order to fulfill that purpose, the Act included provisions in section 588.15 that made the livestock owners responsible for damages caused by their animals that stray upon the public roads. Fisel, 667 So.2d at 763; Zuppardo v. O’Hare, 487 So.2d 39, 40 (Fla. 2d DCA 1986) (“[T]he Warren Act was enacted to impose a duty on owners of livestock to keep their livestock off public roads.”); Davidson v. Howard, 438 So.2d 899, 901 (Fla. 4th DCA 1983) (“It was the purpose of the act to place a duty upon all owners of livestock to prevent their stock from *647 running at large or straying upon the public roads of this state.” (citing § 588.14, Fla. Stat. (1975))). Those delegated rights and responsibilities are between the livestock owners and individuals using the public roads, not the Sheriff. Thus, when the Legislature enacted section 588.16, we do not believe it intended to provide a civil tort remedy for breach of a duty of care owed' by the Sheriff to injured individuals when the Legislature clearly provided thosé individuals a tort remedy against the owner.
Looking only to the specific provisions of section 588.16 and giving them their plain meaning, we see nothing to change' that conclusion. Moreover, as evident by the provisions of sections 588.14 and 588.15, Florida Statutes (2008), the Legislature knows how to impose tort liability for breach'of a duty of care owed to individuals, and we see no similar provision in section 588.16. See Welch v. Baker, 184 So.2d 188, 190 (Fla. 1st DCA 1966) (“Section 588.15 ... must be read in pari mate-ria with the preceding provision, Section 588.14, which lays down the owner’s duty, the negligent breach of which, under Section 588.15, makes the owner liable in damages, as follows: ‘No owner shall permit livestock to run at large on or stray upon the public roads of this state.’ ”).
Finally, if there is a duty of care imposed on the Sheriff by section 588.16, it is a general duty of care owed to the public at large rather than' to any individual. This conclusion is supported by the provisions of section 588.13(3), Florida Statutes (2008), which provide in pertinent part that “[livestock ‘running at large’ or ‘straying* shall mean any livestock ... posing a threat to public safety.” Thus, the duty of law enforcement under the statute is to impound livestock that poses a threat to the public, rather than to Shinkle individually.
Having concluded that pursuant to. the public-duty doctrine,- the Sheriff owed no common law or statutory -duty of care to Shinkle, we must- next address Shinkle’s argument that a special tort duty of care was owed to" her.

IV. The Special Tort Duty Exceptions

As with many'other general principles of law, there are exceptions to the public-duty doctrine. Wallace, 3 So.3d at 1045; Pollock, 882 So.2d at 933. The courts have emphasized that “the public-duty doctrine ... and its exceptions, relate exclusively to the question of whether the government owes a duty of cafe to the individual plaintiff or group of plaintiffs as opposed to the general public.” Wallace, 3 So.3d at 1045 (citing Kaisner, 543 So.2d at 734). The courts recognize that certain conduct of law enforcement officers may create a special duty owed to the injured party; Id.; Pollock, 882 So.2d at 933. In Wallace, the court provided the following disjunctive list of exceptions to the public-duty doctrine:
A special tort duty ... arise[s] when law enforcement officers become directly involved in circumstances which place people within a “zone of risk” [1] by creating or permitting dárigers to exist, [2] by taking persons into police custody, [3] detaining them, or [4] otherwise subjecting them to danger.
3 So.3d at 1048 (emphasis and footnotes omitted) (quoting Pollock, 882 So.2d at 935). The court in Pollock explained that “[t]he premise underlying this theory is that a police officer’s decision to assume control over a particular situation or individual or group of individuals is accompanied by a corresponding duty to exercise reasonable care.” 882 So.2d at 935 .(footnote -omitted). This court and others have held that when determining whether a duty was created by a foreseeable zone of risk, “[t]o impose a duty, it is not enough that a risk merely exists or that-a partfcu- *648 lar risk is foreseeable; rather, the defendant’s conduct must create or control the risk before liability may be imposed.” Bongiorno v. Americorp, Inc., 159 So.3d 1027, 1029-30 (Fla. 5th DCA 2015) (quoting Jackson Hewitt, Inc. v. Kaman, 100 So.3d 19, 28 (Fla. 2d DCA 2011)); see also Kaisner, 543 So.2d at 735-36 (“Where a defendant’s conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.... We see no reason why the same analysis should not obtain in a case in which the zone of risk is created by the police,”) (internal citations omitted); Hernandez v. Tallahassee Med. Ctr. Inc., 896 So.2d 839, 841 (Fla. 1st DCA 2005) (holding that a duty of care is established when “defendant’s conduct created or controlled the risk” (citing Aguila v. Hilton, Inc., 878 So.2d 392, 396-97 (Fla. 1st DCA), rev. denied, 891 So.2d 549 (Fla.2004))). The cases that have applied the special duty exception involved instances where the police officers were on the scene and took control of the situation but individuals were subsequently injured, or involved situations where the police officers created the zone of risk by their actions.[2]
Here, the deputy did not take control over any situation or individual so as *649 to place anyone, including Shinkle, within a zone of risk. Remember that the Sheriff (including the deputy) never had any contact with Shinkle because her accident occurred about an hour and a half after the deputy observed the horses entering the adjacent pasture. Shinkle contends that the deputy created a zone of risk. Specifically, she argues that when the deputy arrived, the lights on his vehicle spooked the horses, causing them to run off the roadway and into the pasture. We reject the argument that this action is enough to create a zone of risk or control the situation. If the deputy’s presence did anything, it lessened any risk that may have been posed by the horses because they left the roadway and returned to the pasture from whence they came. Therefore, we do not believe that a special duty was owed by the Sheriff to Shinkle.
Shinkle argues that if a special tort duty was not owed to her, a duty of care was created pursuant to the undertaker’s doctrine. We address that argument next.

V. The Undertaker’s Doctrine

The undertaker’s doctrine provides that “one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care.” Union Park Mem’l Chapel v. Hutt, 670 So.2d 64, 66-67 (Fla.1996); see also Wallace, 3 So.3d at 1040. Section 323 of the Restatement (Second) of Torts (1965) outlines the parameters of this doctrine and provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other’s reliance upon the undertaking.
Restatement (Second) of Torts § 323 (Am. Law Inst. 1965); see also Wallace, 3 So.3d at 1051 (quoting Restatement (Second) of Torts § 323 (Am. Law Inst. 1965)).[3] This doctrine applies to governmental and nongovernmental entities. Clay Elec. Coop., 873 So.2d at 1186; see also Wallace, 3 So.3d at 1051 (citing Clay Elec. Coop., 873 So.2d at 1186).
As we have previously explained, the deputy’s arrival on the scene did not increase any zone of risk. To the contrary, his arrival caused the horses to reenter the pasture and lessened the risk that had already existed. Shinkle could not have relied on the deputy’s undertaking because she had no contact with the Sheriffs deputy prior to her accident and therefore could not have known of the deputy’s actions. Accordingly, there was no duty created pursuant to the undertaker’s doctrine.

VI. Conclusion

We conclude that the Sheriff did not owe a common law or statutory duty of care to Shinkle. This conclusion bripgs our analysis to an end and renders unnecessary any discussion of the principles of sovereign immunity. Accordingly, we reverse the judgment under review and remand this *650 case- to the trial court to enter judgment for the Sheriff..
REVERSED and REMANDED.
EVANDER and LAMBERT, JJ., eoncur.

. The original constitutional grant first appeared in article IV, section 19 of the Florida Constitution, which was adopted in 1868. See Cauley, 403 So.2d at 381.

. See, e.g., Henderson, 737 So.2d at 536 (holding there was a duty of care arising from a police officer’s act of instructing an intoxicated man to drive to a convenience store and call for a ride home where the driver continued on and subsequently collided with a tree killing two passengers in the vehicle); Kaisner, 543 So.2d at 734 ("In this case, we find that petitioner was owed a duty of care by the police officers when he was directed to stop and thus was deprived of his normal opportunity for protection. Under our case law, our courts have found liability or entertained suits after law enforcement officers took persons into custody, otherwise detained them, deprived them of liberty or placed them in danger. ... Petitioner effectively had lost his ability to protect himself and his family from the hazard at hand, which consisted of onrushing traffic. The only way petitioner could have escaped this threat would have been by disobeying the officers’ instructions that he remain in the general area where they had stopped him, thus subjecting himself to immediate arrest and criminal charges ,.. Thus, the officers owed him and his family a duty of care arising under the common law of Florida.”); Labance v. Dawsy, 14 So.3d 1256, 1259 (Fla. 5th DCA 2009) (discussing a case where complaint alleged that deputies, who knew defendant carried a firearm, entered the defendant's residence to serve a warrant and engaged in a shootout with defendant resulting in plaintiff being shot in hand properly alleged a duty of care based upon "the deputies’ creation of a foreseeable zone of risk to the occupants of Robbins’ residence at the time of the execution of the search warrant”); Brown v. Miami-Dade Cty., 837 So.2d 414, 418 (Fla. 3d DCA 2001) (determining that county officer implementing prostitution sting operation at a hotel owed a duty to exercise reasonable care to avoid harm to innocent bystanders; bystander who tripped and fell after an officer pointed a gun at him and yelled to freeze could proceed with his negligence action); Sams v. Oelrich, 717 So.2d 1044, 1047 (Fla. 1st DCA 1998) (finding that a deputy owed duty to innocent persons in hospital emergency room to reasonably control the acts of escapee taken to hospital by the police: "The escapee’s relative youth and the minor nature of his injury, together with his prior escape attempt, evidence his potential to cause physical harm to others in the confines of the emergency room. Thus, a concomitant duty was placed upon the law enforcement defendant to lessen the risk to those in the immediate proximity of the prisoner by exercising reasonable care to control the movements of the escapee in his custody.”); Creamer v. Sampson, 700 So.2d 711, 713 (Fla. 2d DCA 1997) (holding there was duty owed to innocent plaintiff motorist by police during high-speed pursuit on city streets crowded with traffic while in pursuit of traffic offender who displayed an improper license tag); White v. City of Waldo, 659 So.2d 707, 710 (Fla. 1st DCA 1995) (finding a duty of care arising from police officer’s act of chasing a loose horse in a patrol car with no lights on and a private citizen on the hood).

. The court in Wallace also made reference to the Restatement (Second) of Torts § 324A (1965), which applies to situations where the undertaker agrees to assume a duty owed by another to the injured party. 3 So.3d at 1052. This section is not applicable here because there is no allegation or evidence establishing that the Sheriff agreed with another to undertake a duty owed by that person to Shinkle.