[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10897
_____

D.C. Docket No. 6:11-cv-970-ORL-36-GJK


J. PEARL BUSSEY-MORICE,
as Personal Representative of the
Estate of Preston Bussey, III,

Plaintiff-Appellee,

versus

IVETTE GOMEZ and
GORDON HEWATT,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 1, 2014)

Before WILSON, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This case arises out of the tragic death of Preston Bussey III, who died following officers' attempts to gain control of him after he had been Baker Acted, had refused to cooperate with medical personnel, and had struggled against officers' repeated attempts to bring him under control in a public hospital's emergency-room lobby.

Although the loss of Bussey's life is deeply regrettable, on the facts of this case, we cannot find that Appellants-defendants Officer Ivette Gomez and Sergeant Gordon Hewatt violated Bussey's clearly established constitutional rights. We therefore reverse the district court's denial of summary judgment to the defendants on qualified-immunity grounds.

## I.

In the early morning hours of December 19, 2009, Bussey entered the emergency-room lobby of the Wuesthoff Hospital, bleeding from his arms as a result of self-inflicted wounds. Charge Nurse Amanda McCourt, the hospital's Patient Care Coordinator, was the first to encounter Bussey and described him as "belligerent" and "aggressive." Due to the wounds on his arms and the manner in which he spoke, McCourt believed Bussey to be having an acute psychotic attack.

Triage Nurse Donna Payna and Emergency Room Nurse George Murray assisted McCourt, walking Bussey to a triage room in order to take his vital signs.

2

Bussey told both Payna and Murray that he had a "leech worm" in his arm that he wanted removed.  Murray noted that Bussey was actively bleeding from his arms, and both nurses described Bussey as agitated and belligerent and stated that he refused to follow directions.  Both nurses also reported that they felt threatened by Bussey.  Despite the nurses' efforts to treat him, Bussey refused to allow the nurses to touch him or treat his wounds.

Because of Bussey's behavior and because Murray felt threatened, Murray asked for assistance from the on-duty emergency-room physician, Dr. Edward Mallory.  Bussey again complained to Dr. Mallory that he had a leech worm in his right forearm, and Dr. Mallory noticed that Bussey had dried blood on his hands.  Based upon his observations, Dr. Mallory determined that Bussey was acutely psychotic and hallucinating and concluded that Bussey needed to be Baker Acted for his own protection and for the protection of others.[1]  Dr. Mallory informed Bussey that he would be observed for twenty-four hours and ordered the nurses to administer two anti-psychotic medications to Bussey—Xyprexia and Ativan—to calm him down, noting that Bussey potentially could be violent.  Dr. Mallory also directed the nurses to have hospital security officers strap Bussey to a stretcher with four-point leather restraints.

---

[1]The Florida Mental Health Act ("Baker Act") is found at Florida Statute Sections 394.451, *et seq*.  It provides for the involuntary commitment of a person for a mental-health evaluation.

3

Security Officers Frank Valpetti and William Davis responded to assist in restraining Bussey. The security officers, however, were unable to do so because Bussey told them not to touch him and indicated that he was leaving to go to another hospital. Valpetti described Bussey as "belligerent" and "out of his mind" and stated that Bussey was waving his hands and throwing blood everywhere.

When Bussey attempted to leave the hospital, he became more aggressive, waving his hands toward the security officers and threatening to throw blood on them and attack them. Bussey, who refused to listen to the security officers' commands and left the hospital, pried the ambulance entrance doors open in order to leave.

Upon observing this behavior, another hospital employee, "Jeannie," placed a 911 call to the Rockledge Police Department to seek officers' assistance in apprehending Bussey. Jeannie advised the 911 dispatcher that Bussey had been Baked Acted and had escaped from the hospital. She described Bussey to the dispatcher as "psychotic." Jeannie also reported that Bussey had threatened to fight security and had cocked his fists before running out the door. This was not the only call that hospital employees made to 911. Indeed, a 911 call log reflects that hospital employees placed at least three phone calls to the Rockledge Police Department seeking assistance with detaining Bussey.

4

After fleeing from the hospital, Bussey roamed around the hospital parking lot for approximately fifteen minutes and then returned to the emergency-room lobby before City of Rockledge officers arrived. Shortly thereafter, City of Rockledge police officer Matthew Leverich arrived.

Security Officer Valpetti met the officer outside the hospital, told him that Bussey appeared to be high on drugs, and advised the officer to "glove up" because Bussey was bleeding. Valpetti also relayed to Officer Leverich his opinion that Bussey was not going to comply and that he was going to have a problem with him. Further, Valpetti advised the officer that he would probably need to use a Taser to restrain Bussey.

Officer Leverich entered the emergency-room lobby and saw Bussey standing approximately ten feet away with his hands and arms covered in blood. Leverich described Bussey as just "looking through him" while clenching his fist. In response, Leverich pulled his Taser out and told Bussey several times to get on the ground. Despite Leverich's commands, Bussey did not comply.

During Leverich's initial encounter with Bussey, Officer Gomez entered the hospital with her training officer, Timothy Herberner. Gomez pulled out her Taser and also began instructing Bussey to get on the floor. Again, Bussey failed to comply with Gomez's verbal commands. Instead, Bussey simply stood holding a blood-soaked rag in his hands. The officers described the scene as "really tense."

5

A few moments later, Sergeant Hewatt arrived at the emergency-room lobby and positioned himself between Leverich and Gomez. Hewatt told Bussey that the officers were there to help him. He also explained that he wanted Bussey to get on his knees. Bussey responded, saying that he wanted to call his mother. In reply, Hewatt advised Bussey that he would allow him to call his mother but that Bussey would first need to get on his knees. After repeated requests from various officers, Bussey reluctantly went down to his knees and placed his hands behind his back, but only momentarily.

As the officers gave additional commands to Bussey to turn his body around so that he was facing away from them, Bussey moved his hands back out in front of his torso. After receiving additional directions from the officers, Bussey again placed his hands behind his back, and Sergeant Hewatt again instructed Bussey to turn around. Because Bussey simply stared at Hewatt and did not comply, Hewatt also drew his Taser and again directed Bussey to turn around. When Hewatt drew his Taser, Leverich holstered his Taser.

Then Hewatt began shouting at Bussey to turn around. Although Bussey finally began to turn as if to comply, he again turned back toward the officers. At this point, Hewatt told Bussey that the officers had Tasers and pled with Bussey to comply. When Bussey refused, Hewatt said, "You don't have any idea how much these things hurt, Buddy. Please, I don't want to do this." As Bussey began

6

turning away again, Officer Herberner approached Bussey in order to place him in handcuffs. When Herberner reached to restrain Bussey's arm, however, Bussey jumped up, pulled away, and resisted. Due to Bussey's repeated noncompliance and threatening stance, Sergeant Hewatt stated, he gave a command to tase Bussey, with both Gomez and Hewatt simultaneously deploying their Tasers, administering a five-second round of electrical current to Bussey.

Upon being tased, Bussey fell to the ground in the emergency-room lobby. Either during or after the initial five-second round, Bussey jumped back up to his feet, began attempting to rip the Taser prongs out of his body, and started to approach the officers in a combative manner. Hewatt and Gomez again deployed their Tasers and Bussey again fell to the ground. At this point, the officers attempted to go "hands on" with Bussey, but Bussey again rose, at least to a seated position, and again attempted to rip the Taser prongs from his body. The officers and hospital staff on the scene described Bussey as "out of control" and reported that Bussey continued fighting even after being tased.

During this time, Hewatt repeatedly told Bussey to stay on the ground, but Bussey did not obey the commands. Instead, Bussey fought and shook the officers off him as if they were weightless. Hewatt continued to scream at Bussey to "get down" and to put his hands behind his back. He explained that if Bussey did not comply, the officers would have to tase him again. Bussey continued to fight and

7

struggle, and the officers tased him a third time.   After the third tase, Hewatt instructed the other officers that Bussey was not to be tased anymore[2] and commanded the officers once again to go "hands on."

Officer Leverich then moved in to restrain Bussey's legs.   Hewatt and another officer, Robert Owens, also attempted to pin Bussey down, but Bussey continued to fight and struggle.   Both Leverich and Owens described Bussey as having "unbelievable strength" and kicking and fighting.   Herberner attempted to handcuff Bussey and struggled with him for quite some time.   The officers each testified that Bussey refused to give up his hands and continued to fight.   In the meantime, Nurse McCourt went back to the emergency room to make sure that the ambulance doors were shut and to tell other hospital employees that they were in "lock down."

As the officers struggled with Bussey in the lobby of the emergency room, Nurse Murray entered with a syringe of the anti-psychotic medications ordered by Dr. Mallory and administered them into Bussey's thigh.   Bussey continued to fight and began spitting at the officers.   Because Bussey refused to stop spitting, hospital staff retrieved a sheet, which an officer placed over Bussey's face.   Hospital staff later provided that officer with a pillow case, which the officer placed over

---

[2] In a sworn statement, Hewatt indicated that he had been trained that if the Taser does not achieve the desired effect after three rounds, officers need to resort to other means of restraining the individual.

8

Bussey's face, replacing the sheet. Bussey continued to fight, and various officers took turns cleaning blood off themselves and regaining their energy to restrain Bussey.

After a prolonged struggle, and once the anti-psychotic medications finally took effect, Officer Herberner was able to handcuff Bussey, with at least five other officers assisting him in his efforts to restrain Bussey. Hospital security guards assisted the officers in placing Bussey on a gurney and strapped Bussey's ankles and wrists to the four-point restraints. After Bussey was fully restrained, the pillow case was removed from his face. Later, Nurse McCourt and an officer noticed that Bussey was not breathing. The hospital staff took Bussey back to a room and attempted to revive him for approximately twenty minutes. The attempts to revive Bussey failed, and tragically, Bussey died.

## II.

The Office of the Medical Examiner conducted an autopsy on Bussey. Sajid S. Qaisier, M.D., determined that the cause of death was "cocaine[-]excited delirium." Dr. Qaisier noted as significant factors in Bussey's death other conditions such as pulmonary emphysema, interstitial pneumonitis, and lung adhesions. Defense expert Dr. Deborah Mash agreed with Dr. Qaisier, concluding that Bussey's cause of death was cocaine-excited delirium. Bussey-Morice's

9

expert, Dr. Carl Adams, however, opined that the multiple Taser applications caused Bussey's death.

The Florida Department of Law Enforcement ("FDLE") conducted an investigation into Bussey's death. FDLE Special Agent Ryan Bliss interviewed the officers and hospital employees who were on the scene at the time of the incident. Bliss also conducted a crime-scene walk through, executed a search warrant at Bussey's residence, and reviewed the dispatch tapes. Bliss reviewed the hospital surveillance video which, in his opinion, revealed Bussey's aggressive, non-compliant behavior upon entry to the Wuesthoff Medical Center.[3]

The FDLE report included Taser download information indicating that Hewatt fired his Taser twice—once at 1:53:16 for a ten-second cycle; and again at 1:53:27 for a five-second cycle. The FDLE report also indicates that Gomez fired her Taser four times—once at 2:00:33 for a five-second cycle; once at 2:00:40 for a five-second cycle; once at 2:00:52 for a five-second cycle; and once at 2:01:01 for a five-second cycle. Defense expert, Dr. Mark Kroll, explained that although Gomez deployed her Taser multiple times, both prongs of the device did not make a complete connection with Bussey, so the Taser did not deliver any electrical

---

[3]We have also reviewed the hospital surveillance video, which demonstrates that Bussey failed to comply with the officers' verbal commands upon re-entry to the hospital. In this regard, the surveillance video corroborates the officers' account of the event up until Hewatt and Gomez deployed their Tasers the first time. As Bussey fell to the ground after the first round of Tasers, he and the officers shifted out of view of the surveillance camera.

charge.    A report of information downloaded from the officers' Tasers and authored by Taser International confirms that the Taser's circuit was not completed and pulses were not delivered through one of the probes in Gomez's Taser.   The report further notes that in order for energy to be transferred from the Taser via the probes, contact must be made with the individual by *both* probes to complete the circuit.

### III.

Bussey-Morice, the personal representative of Bussey, brought suit on behalf of Bussey's estate, suing the City of Rockledge as well as the officers involved in the incident.   Bussey-Morice's claims included a Fourth Amendment excessive-force claim against the officers and state-law claims against the City of Rockledge. After discovery, the district court granted summary judgment in favor of the City of Rockledge and all of the officers, except Officer Gomez and Sergeant Hewatt. Consequently, the only claims that survived summary judgment were excessive-force claims brought against Gomez and Hewatt, under 42 U.S.C. § 1983.   Gomez and Hewatt appeal the district court's denial of their motion for summary judgment seeking qualified immunity.   For the reasons set forth below, we now reverse.

11

## IV.

We have jurisdiction to hear appeals from "all final decisions of the district courts of the United States . . . ."  28 U.S.C. §1291.  A district court's denial of a qualified-immunity claim is a "final decision" under Section 1291, to the extent that it turns on an issue of law.  *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985).  Consequently, we have jurisdiction to hear Gomez and Hewatt's appeal.

We review *de novo* the district court's denial of qualified immunity on a motion for summary judgment.  *Wilkerson v. Seymour*, 736 F.3d 974, 977 (11th Cir. 2013) (citation omitted).  Summary judgment should be entered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to Bussey-Morice, the non-moving party.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam) (citation omitted); *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (citation omitted).

## V.

The qualified-immunity defense aims to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Toward that end, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (citation, quotation marks, and brackets omitted).

The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003). Qualified immunity protects from litigation "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Id.* (quoting *Harlow*, 457 U.S. at 815, 102 S. Ct. at 2736) (internal quotation marks & alteration omitted)).

13

Under the qualified-immunity doctrine, a public official must first show that he was acting within the scope of his or her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Here, Gomez and Hewatt undisputedly established this fact, as they were acting within the scope of their discretionary authority as police officers for the City of Rockledge when they encountered Bussey.

The burden then shifts to Bussey-Morice to demonstrate that qualified immunity is not appropriate. *See id.* In order to do this, Bussey-Morice must show that, when viewed in the light most favorable to her, the facts demonstrate that Gomez and Hewatt violated Bussey's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of their actions. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). We may decide these issues in either order, but, to survive a qualified-immunity defense, Bussey-Morice must satisfy both showings. *Maddox*, 727 F.3d at 1120-21 (citation omitted).

Because we find that the alleged illegality of Gomez and Hewatt's behavior was not clearly established at the time of their actions, we need not decide whether a constitutional violation took place. *Id.*

14

## VI.

As we have explained, the touchstone of qualified immunity is notice. *Holmes*, 321 F.3d at 1078. The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

Our circuit uses two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). In the first, "[w]e have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citation omitted). Under this method, "[e]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from the pre-existing law." *See Coffin*, 642 F.3d at 1013 (citations omitted).

The second method involves evaluating the officer's conduct and deciding whether the officer's "conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law'" on point. *Fils*, 647 F.3d at 1291 (alteration in original) (citation omitted). Thus,

15

despite an absence of case law holding the specific conduct unlawful, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Coffin*, 642 F.3d at 1014-15; *see Fils*, 647 F.3d at 1291.

The obvious-clarity method recognizes that although concrete facts are typically necessary to provide an officer with notice of "the hazy border between excessive and acceptable force," when an officer's conduct is "so outrageous that it clearly goes 'so far beyond' these borders, qualified immunity will not protect him even in the absence of case law." *Fils*, 647 F.3d at 1291-92 (citing *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008) (quoting *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926-27 (11th Cir. 2000)). This standard, which offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation, *Priester*, 208 F.3d at 927, is a difficult one to meet.

Here, even viewing the facts in the light most favorable to Bussey-Morice, we find that it was not clearly established at the time of the incident, under either method, that Gomez and Hewatt's conduct violated Bussey's right to be free from excessive force.

First, we agree with the district court that no decision from the United States Supreme Court, this Court, or the Florida Supreme Court has clearly established

16

that an officer's repeated use of a Taser constitutes excessive force under circumstances identical to these.  Consequently, Bussey-Morice must demonstrate that this case presents one of those rare circumstances in which, as a matter of obvious clarity, Gomez and Hewatt's actions violated the Fourth Amendment.  We find that she cannot.

Here, Bussey-Morice relies upon *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), as the district court did, to argue that repeatedly tasing Bussey was such outrageous conduct under the circumstances that every reasonable officer would have known that it violated Bussey's clearly established constitutional right and would have refrained from such activity.  We respectfully disagree with the district court and Bussey-Morice.

*Oliver* is materially distinguishable from this case because, unlike here, in *Oliver*, the officer deployed her Taser against an individual despite his substantial compliance with officers' commands and in circumstances significantly different from those in the instant matter.  We briefly recount the facts of *Oliver* to demonstrate why the case could not have put Hewatt and Gomez on notice that their conduct in this case was so outrageous that it violated Bussey's Fourth Amendment rights.

In *Oliver*, a police officer driving her cruiser noticed Anthony Oliver standing on a grassy median on a busy street, waving his arms and attempting to

17

flag her down.  586 F.3d at 901.  The officer approached Oliver and, during her initial encounter with him, Oliver complied with each of the officer's commands. *Id.* at 901-902.  After the officer left her patrol car and asked Oliver what the problem was, Oliver responded, "They're shooting at me," and then he attempted to walk away. *Id*. at 902.  When the officer asked Oliver to stay and talk, he began to walk quickly toward her.  In response, the officer raised her Taser gun and directed Oliver to step away; he complied. *Id.*  According to a bystander, Oliver never acted in a threatening or belligerent manner, nor did he curse at the officer. *Id*.

A back-up officer arrived at the scene and, although both officers considered taking Oliver into custody under the Baker Act, they never informed Oliver of this fact and never attempted to Baker Act him. *Id*.  The second officer approached Oliver, who was still standing in the median, and asked for his name and identification. *Id.*  Oliver complied. *Id*.  The second officer then tried to coax Oliver across the street by putting his right hand on Oliver's shoulder. *Id.*  Oliver began to back away, momentarily stopping in the turning lane of the street. *Id.*  But when the second officer attempted to force Oliver across the street, holding onto Oliver's shirt, Oliver did not try to grab the officer or otherwise strike him. *Id.*  Without warning, though, the first officer deployed her Taser, and Oliver dropped to the ground. *Id.* at 903.  Once he was on the ground, Oliver never got

back up.  Nor did he hit, kick, punch, or otherwise threaten the officers.  *Id*. Inexplicably, however, a few moments later, the officer tased Oliver again and, ten seconds after that, she tased Oliver for a third time.  *Id*.

As Oliver laid on scorching-hot asphalt, he screamed in pain that it was "too hot."  *Id*.  A bystander stated that when Oliver tried to sit up, he flopped down like a "wet cloth."  *Id*.  After the officer deployed her Taser for a third and fourth round, the officer re-loaded a cartridge in her Taser and began tasing Oliver yet again.  *Id*.  All the while, Oliver laid flat on the hot asphalt.  *Id*.

Once additional backup arrived, the officers finally handcuffed Oliver, but Oliver began to foam at the mouth and his body was limp.  *Id*. at 903.  When the paramedics arrived, Oliver was handcuffed and seated on the median, awake but not talking.  *Id*. at 904.  Once Oliver was placed on a stretcher, he began to have a seizure, and his body temperature was measured at 107 degrees.  *Id*.  Oliver was pronounced dead upon his arrival at the hospital.  *Id*.  A Taser log revealed that Oliver was tased a total of eight times over a two-minute period.  *Id*.

On these facts, we had no problem concluding that although the initial deployment of the Taser may have been justified, the repeated tasing of Oliver was grossly disproportionate to any threat that he posed and was unreasonable under the circumstances.  *Id*. at 907.  Consequently, we found that Oliver had established a violation of the Fourth Amendment.  *Id*.  We also concluded that the force used

19

was so disproportionate to the level of force necessary that any reasonable officer in the situation would have recognized that her actions were unlawful. *Id*. at 908. As a result, we determined that the law was clearly established, not due to bright-line precedent, but as a matter of obvious clarity.

In *Oliver*, we emphasized that Anthony Oliver was not suspected of a crime, and he did not act belligerently or aggressively. *Id.* Oliver also complied with most of the officers' directions and made no effort to flee. *Id.*

Here, on the other hand, although Bussey was not suspected of any crime, hospital staff, security guards, and Rockledge police officers all described Bussey as belligerent, agitated, and out of his mind. Significantly, after examining Bussey, Dr. Mallory determined that Bussey should be Baker Acted because he was psychotic and hallucinating, posing a threat of harm to himself and others.

Further, in *Oliver* we emphasized that Oliver did not actively resist or attempt to evade arrest by flight. In fact, we noted that once tased, Oliver never got back up and never hit, kicked, punched, or threatened the officers. Here, however, Bussey resisted medical staff trying to treat him, and he pried open the ambulance doors and fled from the hospital. When he finally returned and encountered Rockledge police officers, Bussey refused to comply with the officers' repeated commands to get down and turn around. Even after Hewatt pled with Bussey and Hewatt warned that he would deploy his Taser, Bussey never fully

20

complied with the officers' demands. Rather, as Officer Herberner approached, Bussey jumped up from his knees and faced the officers in a threatening stance. He began to move toward the officers. In stark contrast to the facts presented in *Oliver*, Bussey did not merely flop down like a "wet cloth" as Oliver did. Here, each time that Gomez and Hewatt deployed their Tasers, Bussey jumped up, attempted to rip the Taser prongs out of his chest, and combatively approached the officers. Bussey also began spitting, kicking, and fighting with the officers after they deployed their Tasers.

Finally, unlike the circumstances in *Oliver*, Gomez and Hewatt never tased Bussey when he was lying on the ground or was otherwise immobilized. Here, Bussey never ceased his resistance to the officers' attempt to restrain him—Bussey continued to get up after each tase as if the Tasers had no effect on him, and he continued to pose a threat throughout the duration of the officers' encounter with him. This threat extended beyond the officers directly involved to hospital staff and patients, as well as to any individual entering the emergency-room lobby. Charge Nurse McCourt recognized the unusual circumstances and the level of the threat posed by Bussey, retreating to the emergency room to secure the ambulance doors and to instruct fellow employees that the hospital was in "lock down."

On this record, despite the tragic nature of Bussey's death, we simply cannot conclude that clearly established law precluded Gomez and Hewatt from using

21

their Tasers in the manner used here. Rather, we find the circumstances of this case to be more akin to the facts of *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012), a case in which we determined that police officers were entitled to qualified immunity on excessive-force claims in a situation where they repeatedly used their Tasers in an attempt to subdue a mentally unstable arrestee.

In *Hoyt*, James Allen called 911, complaining that he was being sewn up in a suit and that demons were trying to get him. *Id.* at 975. The officer who responded to the call was faced with an aggressive individual who threatened to kill the officer. *Id.* An additional officer arrived at the scene and, at that point, Allen became somewhat compliant, lying down when commanded, but periodically attempted to get up. *Id.* In order to handcuff Allen, officers commanded Allen to place his hands behind his back, but Allen repeatedly failed to comply, placing only one hand behind his back while keeping the other hand outstretched. *Id.* Because Allen refused to comply, one of the officers deployed his Taser. *Id.* When Allen again refused to comply with additional requests to place his arms behind his back, the officer used his Taser against Allen's leg in "dry stun mode." *Id.*[4] Allen continued to roll around on the ground, ignore officers' commands, and refuse to let officers grab his arms and handcuff him. *Id.* at 976. As a result, the officers applied several additional dry stuns and were

---

[4] "Dry stun mode" means that the Taser is pressed directly against the skin and produces a burning sensation.

22

finally able to handcuff Allen's hands, while applying physical force. *Id.* Allen was then placed in the back of one of the officer's patrol cars and, upon arrival at the police station, Allen was found to have no pulse. *Id.*

Faced with these facts, we affirmed summary judgment in favor of the officers on qualified-immunity grounds because we concluded that the law was not clearly established that the officer's conduct violated a constitutional right. *Id.* at 980. We noted that no precedent had staked out a bright line, distinguishing both *Draper v. Reynolds*, 369 F. 3d 1270 (11th Cir. 2004) and *Oliver*. *Id.* at 977. Indeed, we found *Draper* to be distinguishable because the officers in that case were able to handcuff the suspect after one use of the Taser. *Id.* We also determined the facts of *Oliver* to be distinguishable, noting that Oliver complied with most of the officers' directions and Allen did not. In addition, we noted that after one probe-style stun, Oliver was brought to the ground and immobilized, yet the officer reloaded her Taser and repeatedly tased him anyway. *Id.* at 980. We emphasized that Allen was aggressive and continued to pose a danger during the encounter. *Id.* at 979. Based on these significant factual discrepancies, we found that *Oliver* did not put the officers in *Hoyt* on notice that their conduct violated a clearly established constitutional right.

Like Allen in *Hoyt*, Bussey was aggressive and belligerent, and those around him found Bussey's behavior to be threatening. And, also similar to Allen, Bussey

23

refused to comply with the repeated commands given by the officers attempting to restrain him. The application of the officers' Tasers also appeared to have little or no effect on Bussey as he continued to fight and struggle. All hospital staff and officers present during the altercation stated that Bussey spit, kicked, and fought with the officers for a considerable length of time.

Ultimately, we find that the facts here do not present behavior that, under the difficult circumstances present in the hospital's emergency-room lobby on December 19, 2009, was so egregious that it should have been obvious to Gomez and Hewatt that they were violating Bussey's clearly established right when they tased Bussey. Rather, because they were faced with an aggressive, psychotic, non-compliant individual in a hospital, where others could have been injured, Gomez and Hewatt reasonably could have believed that, in deploying their Tasers multiple times, their actions were lawful.

## VII.

Because the facts, viewed in the light most favorable to Bussey-Morice, demonstrate that Gomez and Hewatt did not violate Bussey's clearly established constitutional rights, the district court erred when it denied qualified immunity to these officers. For this reason, the district court's order is **REVERSED**.[5]

---

[5] We also note that Gomez and Hewatt filed a Motion to Strike and for Sanctions, which was carried with the case. In their Motion, Gomez and Hewatt sought to strike pages 42 through 54 of Bussey-Morice's Response Brief, claiming that those pages contain statements that lack

24

---

any support in the record.  The Motion hinges on Bussey-Morice's purportedly untimely responses to certain requests for admission.  Because we find that Gomez and Bussey are entitled to qualified immunity for the reasons set forth above, the Motion to Strike and for Sanctions is **DENIED AS MOOT.**

25