DONALD M. MIDDLEBROOKS, UNITED STATES DISTRICT JUDGE
THIS CAUSE comes before the Court upon Defendants Sheriff Williams D. Snyder, in his official capacity as Sheriff of Martin County, and Deputy Ben Fennell's Motion for Summary Judgment, filed December 12, 2018. (DE 47). Plaintiff Richard Ernest Anderson, as Personal Representative of the Estate of Richard Edward Anderson, responded to Defendants' Motion on January 10, 2019 (DE 57), and Defendants replied on January 17, 2019 (DE 60). The Court heard oral argument on Defendant's Motion on February 27, 2019. (DE 70). Upon full consideration of the submissions of the Parties, the record, and the applicable law, Defendants' Motion is granted.
I. BACKGROUND
On August 28, 2016, Martin County Sheriff's Deputies Ronald Manganiello ("Manganiello"), Robert Calarco ("Calarco"), and Defendant Ben Fennell ("Fennell") responded to emergency calls at the residence of Plaintiff Richard Ernest Anderson ("Plaintiff"). Plaintiff had called 911 because his twenty-three-year-old son, Richard Edward Anderson ("Ricky" or "Decedent") was threatening to hurt himself. On that day, Plaintiff twice called 911 for help with Ricky-the first time, the *1086 Deputies left without taking Ricky into custody for an involuntary examination pursuant to Florida's Mental Health Act (the "Baker Act"), Fla. Stat. § 394.463. The second time, Deputy Fennell discharged his taser on Ricky, who then stabbed himself four times in the chest. Ricky's self-inflicted wounds proved fatal.
Plaintiff brings two causes of action against Defendants: count 1 arises out of the Deputies' response to the first 911 call and states a negligent wrongful death claim against Sheriff Snyder under Florida's Wrongful Death Act, Fla. Stat. § 768.16 - 768.26. (DE 31 ¶¶ 6-17). Count 2 states an excessive force claim under 42 U.S.C. § 1983 against Deputy Fennell, with damages requested pursuant to Florida's Wrongful Death Act. (Id. ¶¶ 18-30).
A. The Baker Act
Florida's Mental Health Act, Fla. Stat. § 394.463, frequently known as the Baker Act, was passed into law in 1971. State of Florida, Department of Children and Families, Mental Health Program Office, History of the Baker Act - Its Development and Intent , at 1 (May 2002). The Baker Act was passed as a repudiation of the way Florida had previously treated and involuntarily committed people with mental health issues. See id. at 1, https://www.dcf.state.fl.us/programs/samh/MentalHealth/laws/histba.pdf. It "substantially strengthened the due process and civil rights of persons in mental health facilities." Id.
The Baker Act provides that people suffering from mental health issues can only be subject to an involuntary examination if they meet certain criteria. See Fla. Stat. § 394.463(1). The Baker Act states:
(1) CRITERIA.-A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:
(a) 1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
2. The person is unable to determine for himself or herself whether examination is necessary; and
(b) 1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.
Id. In addition, the Baker Act contains very specific procedural mechanisms by which an individual who meets the relevant criteria can be subject to an involuntary examination. Id. § 394.463(2)(a). An involuntary examination may be initiated in any one of three ways: "[a] circuit or county court judge may enter an ex parte order stating that a person appears to meet the criteria for involuntary examination and specifying the finding on which that conclusion is based;" [a] physician, clinical psychologist, psychiatric nurse, mental health counselor, marriage and family therapist, or clinical social worker may execute a certificate stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based;" or a law enforcement officer "shall take a *1087 person who appears to meet the criteria for involuntary examination into custody and deliver the person or have him delivered to" a receiving facility, after which the officer must "execute a written report detailing the circumstances under which the person was taking into custody." Id.
According to the Baker Act Reporting Center's Annual Report for fiscal year 2016/2017, 199,994 involuntary examinations were initiated in 2016-17. Baker Act Reporting Center, The Baker Act: Fiscal Year 2016/2017 Annual Report at 5 (June 2018), http://www.dcf.state.fl.us/programs/samh/publications/The% 20Baker% 20Act% 20-% 20FL% 20MH% 20Act% 20-% 20FY% 2016-17% 20Annual% 20Report% 20-% 20Released% 20June% 202018.pdf [hereinafter, the "Report"]. Half of these involuntary examinations (50.23%) were initiated by law enforcement. Id. at 9. In Martin County, 808 involuntary examinations were reported in FY 2016-17.[1] Id. at 24. Nearly 40% (37.62%) of the involuntary examinations in Martin County were initiated by law enforcement. Id.
B. The Factual Circumstances
1. The First 911 Call
Unless otherwise indicated, the facts set forth herein are undisputed. On August 28, 2016, Plaintiff called 911, reporting that his twenty-three-year-old son Ricky had not taken his medicine and was threatening to hurt himself. (DE 46-1, DE 46-11 at 112:10-18). Plaintiff informed the dispatcher that Ricky had attempted to commit suicide nine months prior, and that Ricky was currently agitated and angry. (Id. ) In response to Plaintiff's phone call, Deputies Manganiello, Calarco, and Defendant Fennell arrived at the Andersons' residence. (DE 46-3 at 4:4-5:11; DE 46-4 at 5:22-26; DE 46-5 at 16:2-17:2). Defendant Fennell spoke to Plaintiff and his wife, Lori Anderson ("Mrs. Anderson"), outside the home, but left shortly after arriving to respond to an unrelated call. (DE 46-5 at 17:17-19:8).
Shortly thereafter, members of Martin County Fire Rescue, including Brian Robertson ("Robertson"), arrived at the Anderson residence. (DE 46-2 at 55:17-21). Fire Rescue personnel took Ricky's vital signs. (DE 46-6 at 62:20-63:11). Throughout the Deputies' interaction with Ricky, Ricky seemed calm and behaved normally. (DE 46-3 at 9:8-12, DE 46-4 at 12:17). Deputies Manganiello and Calarco asked Ricky if he wanted to hurt himself or anyone else. (DE 46-3 at 10:3-7, DE 46-4 at 13:5-7). Ricky answered that he did not. (DE 46-3 at 10:3-8, DE 46-4 at 13:5-7). Robertson also asked Ricky if he was suicidal, and Ricky responded that he was not. (DE 46-6 at 106:25-107:6). Ricky indicated to the Deputies that he had plans for the future-to move out from his parent's home and to have a girlfriend. (DE 46-4 at 12:25-13:4).
It is undisputed that Plaintiff insisted to the Deputies that Ricky was going to commit suicide and needed to be taken to the hospital. (DE 46-11 at 101:23-102:2.). One of the Deputies told Plaintiff that the Deputy did not believe that Fire Rescue would take Ricky into custody. (Id. at 102:4-6). Plaintiff alleges that one of the Deputies told Plaintiff that he had no authority to determine whether Ricky would be taken to the hospital.[2] (DE 46-11 at 101:23-102:11).
The parties do not dispute that, while the Deputies were at the Anderson residence, *1088 Ricky stated that he was willing to go to the hospital if his dad wanted him to go. (DE 46-3 at 14:4-14). Ultimately, however, Ricky signed a Refusal Form, which Mrs. Anderson also signed as a witness, indicating that Ricky had refused transport by Fire Rescue to the hospital.[3] (DE 46-8). The Fire Rescue personnel and the Deputies left the Anderson residence.
The Parties agree about much of what occurred while Deputies Manganiello and Calarco were at the Andersons' residence, but they dispute whether the Deputies properly understood their authority under the Baker Act to take Ricky into custody for an involuntary examination. According to Plaintiff's characterization of the events, the Deputies allowed the Fire Rescue personnel to take over the evaluation of whether or not Ricky should have been involuntarily examined pursuant to the Baker Act. (DE 58 ¶ 33). Defendants insist that the Deputies made the determination not to take Ricky into custody pursuant to the Baker Act. (DE 59 ¶ 33).
There is also some question about what the Deputies were told by the police dispatcher about their role in responding to Plaintiff's emergency call, particularly whether the Deputies were dispatched as an assist to Fire Rescue. It is unclear from the record what information was transmitted from the 911 dispatcher to the Deputies regarding the situation at the Anderson residence. The Parties did not submit for the record the notes from the dispatcher that were transmitted to the Deputies, and when the Deputies were deposed, they did not have a clear recollection of what information was given to them. (DE 46-3 at 7:1-3, DE 46-4 at 12:6-14). Deputy Manganiello, for example, testified that he could not recall if he had fully read the dispatch notes before arriving at the Anderson residence. (DE 46-3 at 7:1-3). Deputy Calarco testified that he "believe[d]" the emergency call was relayed "as an assist to fire rescue. It was a kid not taking his medication ... [and] [f]ire rescue requested law enforcement dispatch." (DE 46-4 at 12:6-9). Ultimately, however, this factual question is immaterial to the Motion for Summary Judgment.
2. The Second 911 Call
Immediately after Fire Rescue personnel and the Deputies left, Ricky became agitated again. (DE 61:10-62:6). Plaintiff called 911, informing the dispatcher that he had previously called and that Ricky was now holding a knife and threatening to stab himself. (DE 46-9). Defendant Fennell responded to the second 911 call and arrived at the Anderson residence. (DE 46-5 22:22-25). Hearing voices in the backyard, Defendant Fennell walked to the backyard. (Id. ) There, he observed Plaintiff and Ricky talking. (Id. at 23:1-3). Ricky had a knife in his hand, and Plaintiff was attempting to calm Ricky down. (Id. at 23:1-8). Ricky said, "I just want to talk to my dad." (DE 46-11 at 132:19-20). Defendant Fennell ordered Ricky to put down the knife. (DE 46-2 at 63:13-15). The Parties dispute precisely how events unfolded thereafter, but it is agreed that Ricky turned away from Defendant Fennell and began moving away from him.[4] (DE 46-10). Defendant Fennell then deployed his taser on Ricky. (Id. ) The taser failed to incapacitate *1089 Ricky, who quickly stabbed himself four times in the chest. (DE 46-2 at 64:6-8). Ricky's self-inflicted wounds proved to be fatal. (DE 31 ¶ 28).
II. LEGAL STANDARD
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." Kerr v. McDonald's Corp. , 427 F.3d 947, 951 (11th Cir. 2005) (internal quotations omitted). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." Ellis v. England , 432 F.3d 1321, 1325-26 (11th Cir. 2005). "For factual issues to be considered genuine, they must have a real basis in the record." Id. at 1326 (internal citation omitted).
The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A) ). Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S.Ct. 2548.
After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although all reasonable inferences are to be drawn in favor of the non-moving party, Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita , 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a genuine issue for trial. " Id. at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e) ). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Id. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby , 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, the moving party is entitled to a judgment as a matter of law. Celotex Corp. , 477 U.S. at 323, 106 S.Ct. 2548. The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am. , 894 F.2d 1555, 1558 (11th Cir. 1990).
III. DISCUSSION
The operative complaint, Plaintiff's Second Amended Complaint ("SAC"), initially stated three counts, but Plaintiff dismissed Count 3, against Defendant Martin County Board of County Commissioners, on November *1090 12, 2018 (DE 44). The remaining two counts are as follows: Count 1 arises out of the Deputies' response to the first 911 call and states a negligent wrongful death claim against Sheriff Snyder under Florida's Wrongful Death Act, Fla. Stat. § 768.16 - 768.26. (DE 31 ¶¶ 6-17). Count 2 states an excessive force claim under 42 U.S.C. § 1983 against Deputy Fennell, with damages requested pursuant to Florida's Wrongful Death Act. (Id. ¶¶ 18-30).
A. Count 1: Negligent Wrongful Death
Plaintiff asserts a negligent wrongful death claim against Defendant Snyder in his official capacity, claiming that Snyder is vicariously liable for Deputies Manganiello and Calarco's negligence, which Plaintiff alleges led to Decedent's death. (DE 31 ¶¶ 6-17). Plaintiff offers two theories of the Deputies' negligence: that they were negligent in deferring to Fire Rescue personnel for the determination of whether Decedent should be involuntarily examined pursuant to Florida's Baker Act or, alternatively, that the Deputies were negligent in failing to take Decedent promptly into custody pursuant to the Baker Act. (Id. )
For purposes of summary judgment, the Parties' arguments center around whether the Sheriff owed Decedent a duty of care and whether sovereign immunity shields the Sheriff from liability. These are conceptually distinct analyses, and the Florida Supreme Court has mandated that courts conduct the duty analysis before deciding the applicability of sovereign immunity. Wallace v. Dean , 3 So.3d 1035, 1044, 1053 (Fla. 2009). Because I find that the Sheriff did not owe Decedent a duty of care, I need not analyze whether sovereign immunity would apply here. See Pollock v. Fla. Dep't of Highway Patrol , 882 So.2d 928 (Fla. 2004) ("If no duty of care is owed with respect to alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached.").
1. Legal Standard
A negligence claim under Florida law has four elements that must be proved: (1) the existence of a duty of care, (2) breach of that duty, (3) legal or proximate causation, and (4) actual damages. Id. at 1046 n. 18. While the latter three elements generally present factual questions, the existence of a duty of care is a question of law that a court must decide. Id. at 1046.
Where questions of duty arise in connection with potential governmental liability, Florida's Supreme Court has provided a "rough, general guide" of four categories of governmental activity that either support or fail to support the recognition of a duty of care between a governmental employee and an alleged tort victim:
(I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens.
Id. at 1047 ; Trianon Park Condo. Ass'n, Inc. v. City of Hialeah , 468 So.2d 912, 919 (Fla. 1985). This rubric is generally referred to as the public-duty doctrine. Manfre v. Shinkle , 184 So.3d 641, 645 (Fla. Dist. Ct. App. 2016). The animating principal behind the public-duty doctrine is the concept "that government liability may not be established unless there is a common law or statutory duty of care owed by the government to the individual rather than to the general public. " Id. (emphasis added); see also Wallace , 3 So.3d at 1045 ("[T]he public-duty doctrine ... and its exceptions[ ] relate exclusively to the question *1091 of whether the government owes a duty of care to the individual plaintiff or group of plaintiffs as opposed to the general public"). According to the public-duty doctrine, governmental activities within Categories I and II are owed to the public at large, rather than to individual citizens, and are thus generally immune from tort liability. Wallace , 3 So.3d at 1047. Activities within Categories III and IV, however, are subject to common law duties of care, and may therefore "subject the State to 'substantial governmental liability' based upon traditional principles of tort law." Id. at 1049 (quoting Trianon , 468 So.2d at 921 ). Here, Defendants argue that the Deputies' actions constitute a Category II activity, and Plaintiff classifies the Deputies' actions as Category IV activity. (DE 47 at 5, DE 57 at 12).
Category II encompasses a government's "discretionary power to enforce compliance with the law, as well as the authority to protect the public safety." Trianon , 468 So.2d at 919. Generally, tort liability does not attach to activities within category II; however, a special duty of care may attach if a plaintiff can show that the governmental actor owed the alleged tort victim a special duty of care. Wallace , 3 So.3d at 1047-48. A special tort duty arises "when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger." Pollock , 882 So.2d at 935 ; see also Kaisner v. Kolb , 543 So.2d 732 (Fla. 1989) (finding that plaintiff was owed a duty of care when his car was stopped by police, thereby placing plaintiff in the police's control and custody).
Florida's Supreme Court has stated that "the discretionary power given to judges, prosecutors, arresting officers, and other law enforcement officials" is included within category II. Trianon , 468 So.2d at 919. Florida courts have found that the operation of a 911 call system and the decisions of whether and how to enforce a particular law in a given situation are category II activities. See Wallace , 3 So.3d at 1048 n.20 (regarding enforcement decisions); Pierre v. Jenne , 795 So.2d 1062, 1063 (Fla. Dist. Ct. App. 2001) (regarding a 911 emergency call system). As the Florida Supreme Court has stated, "[t]here has never been a common law duty of care owed to an individual with respect to the discretionary judgmental power granted a police officer to make an arrest and to enforce the law." Everton v. Willard , 468 So.2d 936, 938 (Fla. 1985). "The responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person." Pollock , 882 So.2d at 935.
Category IV activities are those by which a government "[p]rovid[es] professional, educational, and general services for the health and welfare of its citizens." Trianon , 468 So.2d at 921. Category IV activities are distinguishable from the discretionary law enforcement activities within category II because the category IV "service activities, such as medical and educational services, are performed by private persons as well as governmental entities, and common law duties of care clearly exist." Trianon , 468 So.2d at 921. Pursuant to traditional principles of tort law, such activities expose individuals to tort liability; governmental actions of the same type are therefore also susceptible to tort liability. See Wallace , 3 So.3d at 1046, 1049 ; see also Fla. Stat. § 768.28(5) (waiving sovereign immunity and imposing tort liability on the state "in the same manner and to *1092 the same extent as a private individual under like circumstances").
In Wallace v. Dean , the Florida Supreme Court held that the police activity of performing a safety check on a particular individual, pursuant to a 911 call for help, constitutes a category IV activity. Wallace , 3 So.3d at 1049. In Wallace , the police had been called to perform a safety check on Brenda Wallace. Id. at 1043. Though Brenda was unresponsive when the police "repeatedly screamed her name and physically shook her body," the police determined that Brenda was asleep and did not require further medical assistance. Id. The police refused to summon an ambulance and refuted the suggestion that Brenda may have lapsed into a diabetic coma. Id. When Brenda's neighbor checked on her the next day, though, Brenda was still unresponsive. Id. Brenda was transported to a hospital by an ambulance, and she died there five days later without regaining consciousness. Id.
In holding that the police safety check constituted a category IV activity, the Florida Supreme Court explained that "the Sheriff's deputies did not attempt to enforce any law and certainly were not engaged in the protection of the general public; instead, they affirmatively sought to provide a service (a 911 safety check) to a specific individual, Brenda Wallace." Id. at 1049. The Court seems to have considered the police to have been performing a primarily medical or professional function rather than a law enforcement function, writing that courts should categorize actions within the public-duty doctrine based on "the type of act the official or employee has undertaken" rather than based on "the label of the public servant's position." Id. According to the Court, the police's safety check did "not logically fall within any of the Trianon categories save for category IV, 'providing professional, educational, and general services for the health and welfare of ... citizens." Id. (alterations in original). Category II was "inapposite to the case at bar." Id.
In Greer v. Ivey , the Middle District of Florida was also confronted with the question of whether a particular police activity fell within category II or category IV. 242 F. Supp. 3d 1284, 1296-97 (M.D. Fla.), appeal docketed , Case No. 17-14048 (11th Cir. argued Dec. 11, 2018). In Greer , plaintiff Randall Greer had called the police and told them that his brother, Christopher Greer, had threatened him with a knife and had grabbed his wife and threatened her as well. Id. at 1291. Christopher had a history of mental illness, and the local police were aware of his mental ailments. Id. at 1290-91. When police arrived at Christopher's residence, Randall told them that Christopher was inside the house and needed to be evaluated pursuant to the Baker Act. Id. at 1291. When police entered the house, they encountered Christopher holding a knife aloft and advancing toward them. Id. at 1293. The police shot Christopher several times, and he died from his injuries. Id.
The court in Greer categorized the police activity at issue as category II activity, finding that the police were "engaged in the enforcement of law and protection of public safety." Id. at 1297. The court emphasized that the factual circumstances showed that the police were "performing more than a mere safety check": the 911 call described a violent and criminal situation, the police were informed that they were responding to an "assault with a knife," and the police had seen the red marks on Randall's wife's neck from where Christopher had grabbed her. Id. The court found that the police activity in Greer was clearly distinguishable from that in Wallace because the police in Greer were engaged in protecting others from a *1093 person who had already allegedly committed an assault and who clearly seemed to pose a threat to other people. Id. "Although Plaintiff asked that Christopher be evaluated for a Baker Act, and [the police officer] indicated that Christopher's mental health would be handled, this does not change the fact that [the officer] was engaged in the enforcement of law and protection of the public safety."[5] Id.
2. Duty Analysis
In determining whether the Sheriff owed a duty of care to Decedent, I must first determine whether the Sheriff's actions constitute a category II or category IV activity. For the reasons explained below, I conclude that the police function of responding to emergency calls pursuant to the Baker Act is a category II, law enforcement activity, for which the police owe a duty to the general public rather than to individual citizens. Accordingly, Defendants' Motion is granted as to Count 1.
In Trianon , the Florida Supreme Court described category II activities as those by which "a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the law duly enacted by a government body." Trianon , 468 So.2d at 919. These governmental decisions are "a matter of governance, for which there never has been a common law duty of care." Id. The decisions involved in implementing the Baker Act-determining when a person meets the statutory criteria to be taken to a receiving facility for an involuntary examination-are discretionary decisions of how to implement the Baker Act and enforce compliance with it. The Baker Act itself, which allows for involuntary examinations of individuals who are substantially likely to cause "serious bodily harm to himself or herself or others ," demonstrates that such decisions are made at least in part for the purpose of protecting public safety. Fla. Stat. § 394.463(1)(b)(2). Decisions made by police officers pursuant to the Baker Act are therefore paradigmatic law enforcement decisions, for which there is no duty owed to individual citizens. As the Florida Supreme Court has stated, "[t]he responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumed a special duty with regard to that person." Pollock , 882 So.2d at 935.
The law enforcement actions at issue here are unlike the public safety check at issue in Wallace . The police officers in Wallace were not acting pursuant to any statute or attempting to enforce any law. Wallace , 3 So.3d at 1049. A police officer's response to a call pursuant to the Baker Act, however, clearly involves the enforcement of that law.[6] Moreover, the factual circumstances of both this case and of Greer demonstrate that, responding to a Baker Act call is unlike performing a simple safety check. Because one of the Baker *1094 Act's criteria for involuntary examinations is that the individual is substantially likely to cause serious bodily harm to himself or others, officers responding to Baker Act calls may frequently find themselves facing unstable, potentially armed individuals and must be prepared for potentially violent encounters like that in Greer . Responding to these calls is thus clearly within an officer's law enforcement responsibilities.
Having found that the Deputies were performing a category II activity, I must now determine whether they assumed a special duty of care with respect to Decedent. I find that they did not. A special tort duty arises "when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into custody, detaining them, or otherwise subjecting them to danger." Pollock , 882 So.2d at 935. "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." Kaisner , 543 So.2d at 735. In Kaisner v. Kolb , for example, the Florida Supreme Court found that police officers owed a duty to Glen Kaisner, who had been stopped by police because his truck had an expired inspection sticker. 543 So.2d at 733-34. The Florida Supreme Court held that, because Kaisner was "sufficiently restrained of liberty" during the police stop "to be in the 'custody' or control of the police," the police owed him a duty of care for the duration of time he was in their custody. In Henderson v. Bowden , the Florida Supreme Court found that, when the police instructed an intoxicated driver to drive to a nearby gas station, they created a foreseeable zone of risk that gave rise to a legal duty of care. 737 So.2d 532, 536 (Fla. 1999).
There are, however, no facts in this case that would suggest that the Deputies' actions placed Decedent within a zone of risk such as would confer a special duty of care. The Deputies did not take Decedent into custody or exercise control over him. Nor did the Deputies' actions subject Decedent to danger. It is undisputed among the Parties that, for the duration of Deputies Calarco and Manganiello's interaction with Decedent, Decedent was calm and seemingly stable. They asked him whether he was suicidal, and he responded that he was not. He indicated that he had plans for the future. The Deputies, having had a seemingly normal interaction with Decedent, did not place Decedent in a foreseeable zone of risk when they left the Anderson residence.
Accordingly, I find that there was no duty of care owed to Decedent. Accordingly, Defendants' Motion for Summary Judgment is granted as to Count 1.
B. Count 2: Excessive Force
In Count 2, Plaintiff brings a claim under 42 U.S.C. § 1983, alleging that Deputy Fennell's actions in response to the second 911 call violated Decedent's rights under the Fourth and Eighth Amendments. (DE 31 ¶ 29). The Parties agree that Defendant Fennell is entitled to summary judgment on Plaintiff's claim that Defendant Fennell violated Decedent's Eighth Amendment rights. (DE 57 at 15). However, Plaintiff's Fourth Amendment claim against Defendant Fennell remains. Defendant Fennell argues that he is entitled to qualified immunity for his actions. For the reasons stated below, I agree.
"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly *1095 established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro , 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotations omitted). In order to receive qualified immunity, government officials must show that they were acting within the scope of their discretionary authority when they committed the allegedly wrongful acts. Oliver v. Fiorino , 586 F.3d 898, 905 (11th Cir. 2009). Once officials show that they were acting within their discretionary authority, the burden shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Id. As it pertains to the events at issue in Count 2, the Parties agree that Deputy Fennell was acting in his discretionary authority. (DE 47 at 11, DE 57 at 16).
To determine whether qualified immunity applies, courts conduct a two-step analysis, determining (1) whether the facts, when construed in a light most favorable to plaintiff, establish that a constitutional violation has been committed, and (2) whether the constitutional violation was "clearly established" at the time of the incident. Id. (quoting Pearson v. Callahan , 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). Pursuant to Pearson v. Callahan , courts can undertake this two-step inquiry in whatever sequence they choose. Pearson , 555 U.S. at 236, 129 S.Ct. 808. Here, I do not need to consider whether Defendant Fennell's actions constituted excessive force in violation of the Fourth Amendment because I find that, even if there were such a violation, it was not clearly established.
There are two ways to determine if a right is clearly established. First, a constitutional right may be clearly established if there is an existing decision by the U.S. Supreme Court, the Eleventh Circuit, or Florida's Supreme Court that would give officers "reasonable warning" that their conduct violated constitutional rights. Smith , 834 F.3d at 1291 (quoting Holloman ex rel. Holloman v. Harland , 370 F.3d 1252, 1277 (11th Cir. 2004) ). Such a precedential case need not be " 'on all fours,' with materially identical facts" in order to render a constitutional violation clearly established; instead, "[a] principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court.' " Holloman , 370 F.3d at 1277 (quoting Hope v. Pelzer , 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ). Second, a right may be clearly established if the officer's allegedly violative "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law on point." Bussey-Morice v. Gomez , 587 Fed. Appx. 621, 627 (11th Cir. 2014) (quotations omitted) (alteration in original); see also Oliver , 586 F.3d at 907-08. This second method "recognizes that although concrete facts are typically necessary to provide an officer with notice of 'the hazy border between excessive and acceptable force', when an officer's conduct is 'so outrageous that it clearly goes so far beyond these borders, qualified immunity will not protect him even in the absence of case law.' " Bussey-Morice , 587 Fed. Appx. at 627 (quoting Fils v. City of Aventura , 647 F.3d 1272, 1291-92 (11th Cir. 2011) ).
Here, it is undisputed that Decedent was armed with a knife and that Defendant Fennell had ordered him to drop the knife. (DE 46-2 at 63:13-15). Decedent did not comply with Fennell's order, and instead turned away from Fennell. (DE 46-10). Defendant Fennell deployed his taser once on Decedent. (Id. ) Such use of a taser does not violate a clearly established right.
*1096 The Eleventh Circuit has repeatedly upheld the use of a single taser shock as an acceptable means of attempting to calm an agitated person. See Oliver , 586 F.3d at 906 (finding that "the use of an initial, single taser shock to calm the suspect may have been justified"); Draper v. Reynolds , 369 F.3d 1270, 1278 (11th Cir. 2004) (finding that a single taser shock was reasonable under the circumstances). This is true even where, as here, the person upon whom police discharged a taser was known to suffer from mental illness and was unarmed. See Bussey-Morice , 587 Fed. Appx. 621 (holding that police who discharged taser three times on a mentally ill man, who was in the midst of a psychotic episode and very belligerent, were entitled to qualified immunity).
The Eleventh Circuit has also upheld the use of nonlethal force, such as that with a taser, on a person who is armed with a knife. See Smith v. LePage , 834 F.3d 1285, 1294-95 (11th Cir. 2016) (sanctioning use of taser on suspect armed with knife); see also McCormick v. City of Ft. Lauderdale , 333 F.3d 1234 (11th Cir. 2003) (holding that use of pepper spray was not excessive on suspect who was armed with a stick). As Plaintiff admitted at oral argument, there are no precedential cases showing that Defendant Fennell's use of force violated a clearly established right. The cases cited by Plaintiff are factually distinct from the scenario in which Defendant Fennell found himself at the Anderson house, and generally involve situations in which police discharged tasers numerous times on people who were not suspected of any crime and/or who were compliant with the police's orders. See Glasscox v. Argo , 903 F.3d 1207 (11th Cir. 2018) (finding that police officer was not entitled to qualified immunity for discharging a taser repeatedly and in rapid succession on a person who was not resisting); Fils , 647 F.3d 1272 (finding that police were not entitled to qualified immunity where they used a taser on a person who was compliant with police requests and who was suspected of only a minor crime); Oliver , 586 F.3d 898 (finding that police were not entitled to qualified immunity for discharging a taser eight to twelve times on a person who was not suspected of any crime and who was not resistant).
Accordingly, I find that Defendant Fennell is entitled to qualified immunity for his actions in response to the second 911 call. Defendant's Motion for Summary Judgment is granted as to the claims against Defendant Fennell.
It is hereby ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (DE 47) is GRANTED. Final Judgment in favor of Defendant will be entered by separate order.
SIGNED in Chambers in West Palm Beach, Florida, this 20th day March 2019.

According to the Report, 7.33% of involuntary examination forms did not list county of residence. Report at 24.

Defendants dispute whether one of the Deputies made that statement to Plaintiff, but such dispute is immaterial.

Plaintiff disputes that Ricky signed the Refusal Form, but the Form appears to bear his handwritten name. (DE 46-8). Regardless, such dispute is immaterial.

Plaintiff asserts that Ricky walked away from Defendant Fennell, and Defendant asserts that Ricky ran away from Defendant Fennell. The surveillance video from the Andersons' backyard shows that Ricky began walking away from Defendant Fennell and then started to run away. (DE 46-10). However, this factual dispute is immaterial.

The court in Greer also noted that, in its estimation, even if the police had been solely focused on involuntarily committing Christopher pursuant to the Baker Act, the police would still have been engaged in category II activity. Greer , 242 F. Supp. 3d at 1297.

To the extent that Plaintiff contends that the Baker Act confers upon the Sheriffs and his Deputies a statutory duty of care, such argument was raised for the first time at oral argument and did not appear in Plaintiff's pleadings on the Motion for Summary Judgment. Regardless, this argument does not change my conclusion that police officers' duties to enforce the Baker Act are law enforcement activities owed to the general public. See Pollock , 882 So.2d at 934-35 (finding that there was no statutory duty because the police action at issue was in furtherance of a category II activity).